## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DR. MARK R. GEIER, *et al.*, | * | |
| Plaintiffs, | * | |
| vs. | * | Case No. 1:12-cv-01171 (RMC) |
| CONWAY, HOMER & CHIN-CAPLAN P.C., *et al.,* | * | |
| Defendants. | * | |

---

### PLAINTIFFS' COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE DEENDANTS' MOTIONS TO DISMISS

---

# <u>TABLE OF CONTENTS</u>

I.      **INTRODUCTION** ........................................................................................... 1

II.     **STATEMENT OF FACTS** ............................................................................. 1

III.    **POINTS AND AUTHORITIES** ..................................................................... 5

    **A. The PSC Is A Joint Venture** ........................................................................ 5

        **1.  Plaintiffs Alleged Sufficient Facts to Demonstrate the PSC
             Was a Joint Venture in Fact** ............................................................... 5

        **2.  Plaintiffs Have Alleged Sufficient Facts to Prove a Joint
             Venture by Estoppel** ........................................................................... 12

    **B. This Court Has Specific Jurisdiction Over the Defendant Law Firms** ........................... 15

        **1.  The Defendant Law Firms Are Subject to Specific Personal
             Jurisdiction in this Forum Based on Their Own Minimum Contacts** ...................... 16

        **2.  The District of Columbia Contacts of the PSC Are Imputed to
             The PSC Member Firms** ..................................................................... 18

        **3.  The District of Columbia Contacts of the Williams Love Law Firm
             Are Imputed to the PSC Member Firms** .................................................. 21

        **4.  The Contract Has A Substantial Connection to the District of Columbia** ............. 25

        **5.  The Tortious Injury and Acts Occurred in the District of Columbia** ................. 26

        **6.  The Parties Have Already Litigated that the Forum Selection Clause
             of The Contract Has No Force and Effect** ................................................ 28

        **7.  The "Government Contracts" Doctrine is Inapplicable to This Case** .................. 29

    **C. This Court Has General Jurisdiction Over Each of the Defendant
        Law Firms** ...................................................................................... 30

    **D. Defendants May be Held Liable on the Contract Even If the PSC
        Lacked Capacity to Enter Into Contracts** ............................................... 32

      **1.** **The PSC Was a Non-Equity, Incapable of Entering Into Contracts**............................ 32

      **2.** **Defendants May Be Held Liable as "Promoters"**.............................................. 33

  **E.** **Plaintiffs Have Pled Sufficient Facts to Support Defendant's Ratification of the Contract** ........................................................35

  **F.** **The Geirs' Contract Requires the PSC to Pay "Non-Contingent" Fees** ...............37

      **1.** **The Defendants' Construction of the Contract is Contrary to the Contract Language and the Vaccine Court Rules and Guidelines**............................ 37

      **2.** **The Plaintiffs' Fees are Not Limited by the Vaccine Act** ............................... 43

  **G.** **The Geirs Have Properly Pled a Claim for Unjust Enrichment** .............................44

  **H.** **Plaintiffs Have Stated a Claim for Joint and Several Liability For Professional Negligence** ........................................................46

  **I.** **Plaintiffs Have Stated A Valid Claim For Professional Negligence** ........................................ 47

  **J.** **The Geiers Have Sufficiently Pled Civil Conspiracy** ..................................52

  **K.** **Plaintiffs Have Sufficiently Pled a Claim Based on Breach of Implied Contract**........................................................55

**III.** **CONCLUSION**................................................................................ 56

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Aigner v. Bell Heliciopters, Inc.,* 86 F.R.D. 532 (N.D. Ill. 1980) ................................................ 24

*Acosta Orellana v. CropLife Int'l,* 71 F.Supp.2d 81 (D.D.C. 2010) ........................................... 54

*Ali Baba Co., Inc. v. WILCO, Inc.*, 482 A.2d 418 (D.C.App. 1984) ............................................ 28

*American Trade Partners, L.P. v. A-1 Intern. Importing,* 755 F.Supp. 1292 (E.D. Pa. 1990) .................. 55

*Basciano v. L&R Auto Parks, Inc.* 2011 WL 6372455 (E.D.Pa. 2011) ......................................... 19

*Beck by Beck v. Sec'y of HHS,* 924 F.2d 1029 (Fed.Cir. 1991) ............................................... 43, 44

*Beckman v. Farmer,* 579 A.2d 618 (D.C. App. 1990) ...................................................... 6, 10, 11

*Brown v. 1401 N.Y. Ave., Inc.*, 25 A.3d 912 (2011) ...................................................... 10

*Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 931 F.Supp. 592 (N.D.Ill. 1996) ........................ 20

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ......................................................... 5

*Burnett v. Al Baraka Inv. and Development Corp.*, 247 F.Supp.2d 86 (D.D.C. 2003) ........................ 52, 53

*Carroll v. Freemont Inv. & Loan,* 636 F.SUpp.2d 41 (D.D.C. 2009) ........................................... 54

*Cent. States, Se. & Sw. Areas Pension Fund v. Joe McClelland, Inc.,*
   23 F.3d 1256 (7th Cir. 1994) ........................................................................ 41

*Certain Underwriters at Lloyd's, London v. Garmin International Inc.,*
   2012 WL 1158849 (D.Kan. April 6, 2012) ............................................................. 24

*Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*,
   695 So.2d 383 (Fla.Dist.Ct.App. 1997) ............................................................. 45

*Conley v. Gibson*, 355 U.S. 41 (1957) .................................................................... 53

*Cowal v. Hopkins*, 229 A.2d 452 (D.C.App. 1967) ......................................................... 43

*Daynard v. Ness, Motley, et al.,* 290 F3d, 42 (1st Cir. 2001) ............................................. 21, 23

*Ellipso, Inc. v. Mann,* 2006 WL 1126814 *1 (D.D.C. 2006) ...................................................... 33

*Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss & Brecher,*
   635 F.supp. 15 (E.D.Pa. 1985) ....................................................................................... 55

*Exponential Biotherapies, Inc. v. Houthoff Buruma, N.V.,* 638 F.Supp.2d 1 (D.D.C. 2009) ..................... 25

*Faison v. Nationwide Mortg. Corp.,* 839 F.2d 680 (D.C.Cir. 1987)............................................. 46

*Fraser v. Gottfried,* 636 A.2d 430 n.6 (D.C. App. 1994) ..................................................... 6

*Georgia Casualty Co. v. Hoage,* 59 F.2d 870 (1932) ......................................................... 6
*Halberstam v. Welch,* 705 F.2d 472 (D.C.Cir. 1983)......................................................... 53

*Harnett v. Washington Harbour Condominium Unit Owner's Assoc.,*
   ___ A.3d _____ (D.C.App. July 16, 2012) ........................................................................ 29

*Harrington v. Trotman,* 983 A.2d 342 (D.C. 2009)........................................................... 44

*Helmer v. Doletskaya,* 393 F,3d 201 (D.C. Cir. 2004) ...................................................... 15

*In re Bernstein,* 707 A.2d 371 (D.C. 1998)................................................................. 49

*In re: Claims for Vaccines Injuries Resulting in Autism Spectrum Disorder or a*
*Similar Neurodevelopmental Disorder Various Petitioners v. Sec. of HHS,*
   2002 WL 31696785 (Fed. Cl. 2002) ........................................................................ 8, 11

*In re FEMA Trailer Formaldehyde Prods. Liab.,* 401 F.App'x 877 (5th Cir. 2010)..................... 33

*In re Lieber,* 442 A.2d 153 (D.C. 1982) ......................................................... 48, 49

*In re Ryan,* 670 A.2d 375 (D.C. 1996).......................................................................... 48

*In re Zyprexa Prods. Liab. Litig.,* 451 F.Supp.2d 458 (E.D.N.Y. 2006) ................................. 32

*Intercont'l Leasing, Inc. v. Anderson,* 410 F.2d 303 (10th Cir. 1969)......................................... 20

*Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29 (D.C. 1982) ........................... 43

*International Shoe Co. v. Washington,* 326 U.S. 310 (1945)................................................. 20

*Jackson v. Loews Washington Cinemas, Inc.,* 944 A.2d 1088 (D.D.C. 2008)...................... 17, 18

*Jonathan Woodner Co. v. Laufer*, 531 A.2d 280 (D.C. 1987) ............................................................ 6, 11, 35

*Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*,
   870 A.2d 58 (D.C. 2005) ............................................................................................................. 45

*Kim Kealy v. CTP, Inc.*, 1994 WL 846898 (N.D. Ill. 1994) ............................................................... 55

*King v. Sec'y HHS*, 2011 WL 5926126 ........................................................................................... 10

*Kopff v. Battaglia,* 425 F.Supp.2d 76 (D.D.C. 2006) ........................................................................ 15

*Lewis v. Washington Metro. Area Transit Authority* 463 A.2d 666 (D.C. 1983) ............................ 35

*Lex Tex Ltd. V. Skillman*, 579 A.2d 224 (D.C. 1990) ....................................................................... 30

*McDaniel v. Armstrong World Industries,* 603 F.Supp 1337 (D.D.C. 1985) .............................. 16, 17

*McGrath v. McGrath*, 55 App. D.C. 221 (1925) ............................................................................... 12

*McIntosh v. Group Health Association, Inc.,* 138 A.2d 496 (D.C.Mun.App. 1958) ....................... 43

*Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93 (3rd Cir. 2004) ......................................................... 19

*National Labor Relations Bd. v. Local 32B-32J Serv. Employees Int'l Union, AFL-CIO,*
   353 F.3d 197 (2nd Cir. 203) ........................................................................................................ 41

*Nolan v. Foreman*, 665 F.2d 738 (5th Cir. 1982) .............................................................................. 48

*Novak-Canzeri v. Turki Abdul Alziz Al Saud,* 864 F.Supp 203 (D.D.C. 1994) .............................. 25

*Oetiker v. Jurid Werke, G.m.b.H,* 556 F.2d 1 (1997) ....................................................................... 27

*Orndorff v. Cohen*, 62 A.2d 794 (D.C. Dec. 14, 1948) ..................................................................... 13

*Paschall's, Inc. v. Dozier*, 407 S.W.2d 150 (1966) .......................................................................... 45

*Phar-Mor, Inc., Secs. Litig.,* 874 F.Supp. 277 (W.D.Pa. 1994) ....................................................... 19

*Phillips v. U.S.,* 59 F.2d 881 (1932) ................................................................................................ 19

*Poling v. Farrah*, 131 F.Supp.2d 191 (2001) .................................................................................. 27

*Pottash Bros. v. Burnet*, 50 F.2d 317 (1931) ................................................................................. 19

*Shoreham Hotel Ltd. Partnership v. Wilder*, 866 F.Supp. 1 (D.D.C. 1994) ................................................ 34

*Singer v. Scher*, 761 F.Supp. 145 (D.D.C. 1991) ................................................................ 10

*Sisso v. Islamic Rep. of Iran,* 448 F.Supp.2d (2006) .......................................................... 27

*Smith v. Jenkins*, 452 A.2d 333 (D.C. App. 1982) .............................................................. 15

*Smith v. Lancaster*, 37 App. D.C. 25 (D.C. Cir. 1911) ....................................................... 12

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C.Cir. 2000) ................................... 53

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) .................................................... 52, 53

*Tabb v. District of Columbia,* 447 F.Supp.2d 185 (D.D.C. 2007) ..................................... 55

*Thermo Contracting Corp. v. Bank of New Jersey*, 354 A.2d 291 (1976) .......................... 35

*Thompson v. Hiter*, 356 Ill.App.3d 574 (2005) .................................................................. 10

*Union Light & Power Co. v. D.C. Dep't of Empl. Servs.*, 796 A.2d 665 (D.C. 2002) ........... 55

*Venizelos S.A. v. Chase Manhattan Bank*, 425 F.2d 461 (2nd Cir. 1970) ........................... 41

*Vereen v. Clayborne*, 623 A.2d 1190 (D.C. 1993) ............................................................ 55

*Walsh v. Schlecht,* 429 U.S. 401 (1977) ............................................................................ 41

*Washington Inv. Partners of Del., LLC v. Securities House, K.S.C.C.*,
    28 A.3d 566 (D.C. App. 2011) .................................................................................... 6

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ................................... 20

*Wultz v. Islamic Rep. of Iran,* 755 F.Supp.2d 1 (2010) .......................................... 27, 28, 30

## Statutes, Regulations, Codes

Fed.R.Civ.P. 8(a)(2) .......................................................................................................... 52

Fed.R.Civ.P. 9(b) ............................................................................................................. 52

Fed.R.Civ.P. 15(a) ........................................................................................................... 32

42 U.S.C. §300aa-15(e)(1)(B) .......................................................................................... 41

D.C. Code §13-423 ........................................................................................................ 15

D.C. Code §13-423(a)(1) ........................................................................................ 16, 26

D.C. Code §13-423(a)(3) ............................................................................................. 27

D.C. Code §13-423(a)(4) ............................................................................................. 26

D.C. Code §29-302.04 ................................................................................................. 33

D.C. Code §29-402.04 ................................................................................................. 33

D.C. Code §29-603.01 ................................................................................................. 19

D.C. Code §29-603.06(a) ............................................................................................ 19

D.C. Code §29-603.08(a) ............................................................................................ 12

D.C. Code §29-604.01(k) ............................................................................................ 10

4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure §1069.7* ........................ 28

46 Am.Jur.2d *Joint Ventures* §50 ................................................................................... 11

Restatement (Second) of Contracts §157, cmt. b ............................................................................. 37

## EXHIBIT LIST

A.  Declaration of Dr. Mark Geier

B.  Declaration of David Geier

C.  9/24/03 Autism Update and Order

D.  1/14/08 Motion to Substitute PSC Committee Member

E.  1/14/08 Notice Re Roster of Executive Committee of PSC

F.  2003 Executive Committee List

G.  Witness List

H.  7/30/08 Letter from Powers to Geiers

I.  General Order No. 1

J.  Williams and Powers Discovery Responses

K.  Judgment

L.  Williams Kherker Expense Submission

M.  Williams Kherker Article

N.  John H. Kim Article

O.  John H. Kim Billing Records

P.  Lommen Article

Q.  Conway Article

R.  Vaccine Guideline XIV

S.  Vaccine Court Rule 15

T.  Interim Fee Application

U.  Check Issued from Vaccine Court

V.  10/03/03 Geier Invoice

W.     PSC Discovery Responses

X.     7/16/09 Email from Powers to Geiers

# I.  INTRODUCTION

The Plaintiffs, DR. MARK R. GEIER and MR. DAVID A. GEIER, by and through their attorneys, James R. Klimaski and James M. Love, submit this combined Memorandum of Points and Authorities in opposition to each of the Defendants' Motions to Dismiss.  For the reasons set forth below, the Defendants' Motions should be denied.

## II.  STATEMENT OF FACTS

This case arises from a contractual relationship between Plaintiff, Dr. Mark Geier, as expert witness and consultant, and Plaintiff, David Geier, as a consultant, and a joint venture of law firms and attorneys from around the country.  The joint venture was formed in the Spring of 2002 and is referred to as the Petitioners' Steering Committee (hereinafter referred to as the "PSC").   These law firms represented nearly 5,000 petitioners who alleged that vaccines administered to them as children caused autism and inflicted damages compensable under the Vaccine Act.   Claims were filed against the United States' Secretary of Health and Human Services in the Vaccine Court.  [Complaint, ¶ 29]

One of the PSC's tasks was to organize and present a series of "test cases" demonstrating a general causation theory that the vaccines were linked to the petitioners' autism, which could then be used by the remaining petitioners to prosecute their claims.  *Id.*  The members of the PSC worked together to complete discovery, enter into necessary contracts, hire and consult with expert witnesses, participate in meetings with the Vaccine Court, prepare pleadings to the Vaccine Court, present the test cases, and, in some instances appeal the test cases.  *Id.*  All of the Defendants named in this lawsuit were members of the PSC at all relevant times herein.  Additionally, the law firm of Williams Love O'Leary & Powers, P.C. ("Williams Love"), was a member of the PSC joint venture.  Williams Love and attorneys Michael Williams and Thomas

Powers, partners in Williams Love, are being sued in Montgomery County, Maryland by the Plaintiffs herein.

To accomplish its purpose in presenting test cases to the Vaccine Court, the PSC hired several experts to support their theories, including the Plaintiffs in this case.  Indeed, during the latter part of 2003, Plaintiff Dr. Geier was visited at his home in Maryland by various members of the PSC who informed Dr. Geier that the PSC wanted to hire him for consulting services and other related services such as providing expert witness testimony on behalf of one or more clients who were contemplating litigation or who were already involved as litigants in the Vaccine Court.  Thereafter, on or about September 18, 2003, Dr. Geier and the PSC, by and through the law firms named in this lawsuit, entered into a Consulting Agreement whereby Dr. Geier agreed to provide consulting services to the PSC pursuant to certain agreed terms.  [2003 Agreement, Plaintiffs' Exhibit 1 to the Plaintiff's Complaint; Dr. Geier Declaration, ¶ 2, Exhibit A attached hereto]  The 2003 Agreement provided, *inter alia*, that the PSC "….shall be responsible for payment to [Dr. Geier] and that payment is due to Geier on a timely basis regardless of the timing or outcome of any settlement, litigation or contemplated litigation."

On October 8, 2004, Plaintiffs Dr. Geier and David Geier, signed a written amendment to the 2003 Agreement entitled "Expert Consulting Agreement" (hereinafter "2004 Amendment"). [Expert Consulting Agreement, Exhibit 2 to Plaintiffs' Complaint, incorporated herein]  At the time that the Plaintiffs signed the 2004 Amendment, attorneys Michael Williams and Thomas Powers, acting on behalf of the PSC, represented to Plaintiffs that, going forward, the PSC could not afford to pay Plaintiffs on a monthly basis. [Exhibit A, ¶ 5; David Geier Declaration, Exhibit B, ¶ 1]  Defendants Williams and Powers, acting on behalf of the PSC, assured the Plaintiffs that payment under the Consulting Agreement and the 2004 Amendment thereto would be deferred

until such time as the Vaccine Court decided the fee application that would later be submitted to the Vaccine Court by the PSC. *Id.* Williams and Powers, acting on behalf of the PSC, further assured that the payment of the Plaintiffs' fees was not contingent, and that the PSC would pay the Plaintiffs their fees at the time set forth in the Consulting Agreement and the 2004 Amendment thereto. [*Id*; Plaintiffs' Complaint, ¶ 21] The 2004 Amendment was signed by Williams on behalf of the PSC. [*See* Exhibit 2 to Plaintiffs' Complaint]

The Geiers submitted invoices for services rendered under the 2003 Agreement but were not paid for all of these services. [Complaint, ¶ 25] Plaintiffs submitted invoices for services rendered under the 2004 Amendment on an ongoing and timely basis while continuing to provide consulting services to the PSC, but none of those invoices were paid. The combined outstanding balance owed under the 2003 Agreement and the 2004 Amendment is approximately Six Hundred Thousand Dollars ($600,000.00).

Rather than pay the Plaintiffs as agreed per the contracts, the PSC asserted for the first time in 2009 that the 2004 Amendment did not require the PSC to pay for Plaintiffs' consulting services. [Exhibit A, ¶ 11; Exhibit B, ¶ 6] Instead, the PSC insisted that Geiers' exclusive recourse was to apply to the Vaccine Court for an award of fees and costs. The members of the PSC, and Williams and Powers, assert that they agreed only to "support" the Plaintiffs in recovering their fees and costs from the Vaccine Court. The PSC therefore submitted a combined fee petition to the Vaccine Court requesting payment for numerous attorney fees and costs, including the Plaintiffs' fees. The PSC engaged in settlement negotiations on behalf of the Plaintiffs with the Department of Justice for payment of Plaintiffs' fees, but failed to secure a settlement. As a result, Williams and Powers prepared and submitted legal briefs and arguments on behalf of the Plaintiffs in an attempt to secure an award from the Vaccine Court. When these

attempts failed, Williams and Powers then filed appeal briefs on behalf of the Plaintiffs. [Exhibit A, ¶¶ 12; Exhibit B, ¶¶ 7] Unquestionably, the PSC, through Williams and Powers, were representing the Plaintiffs as their attorneys, and as detailed in Plaintiffs' Complaint ¶¶ 60. Williams and Powers breached their duty of care to the Plaintiffs in performing these duties. As a result, the PSC, a joint venture, is liable for this breach, and the individual law firms, as joint venturers, are vicariously liable for the Plaintiffs' damages.

The Geiers brought a breach of contract claim and, alternatively, an unjust enrichment claim in a lawsuit filed in Maryland against the PSC and some of its members, including the Defendants herein. Williams and Powers were also named as Defendants, and the Geiers asserted legal malpractice claims against them. The 2003 Agreement contains a forum selection clause reflecting that the parties chose Montgomery County, Maryland, as the forum for any future lawsuit. The Defendants herein argued that they were not subject to the personal jurisdiction of the Maryland Court, and that the forum selection clause was not applicable to them. The Maryland Court agreed and dismissed these Defendants from the case. The PSC, Williams Love, Williams, and Powers did not contest jurisdiction and are still Defendants in Maryland. The Defendants who were dismissed were each joined to the instant case.

### III.  ARGUMENTS AND AUTHORITIES

**A.  The PSC Is A Joint Venture**

Defendants assert that the Court Two – Breach of Contract – and Court Six – Joint and Several Liability for Professional Negligence – which rely on the characterization of the PSC as a joint venture, should fail as a matter of law because Plaintiffs did not offer sufficient support for the existence of a joint venture and, in any event, the PSC cannot be fairly characterized as one. Defendants' Motions to Dismiss should be denied as Plaintiffs have alleged sufficient facts

to establish that the PSC was a joint venture, or, in the alternative, have created an issue of fact that precludes dismissal.

## 1.  Plaintiffs Alleged Sufficient Facts to Demonstrate the PSC Was a Joint Venture in Fact

In deciding a Motion to Dismiss, a court is not tasked with the responsibility of determining the truth of the plaintiff's assertions or the likelihood that he has evidence to support them, but rather – taking all factual allegations as true – whether he can prove a set of facts in support of his claim that would entitle him to relief.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Here, Plaintiffs have pled sufficient facts to support their allegation that the PSC was a joint venture and that Defendants are therefore jointly and severally liable for Plaintiffs' damages.  If, however, this Court finds otherwise, Plaintiffs request leave to amend their complaint as discovery in a related matter has provided additional facts in support of Plaintiffs' allegations in this case.

District of Columbia courts have recognized that "[s]trictly speaking, a joint venture is not the same as a partnership, but there is very little law applicable to one that does not apply to the other.  Principals of partnership law, in particular the Uniform Partnership Act, apply in most instances to joint ventures." *Jonathan Woodner Co. v. Laufer*, 531 A.2d 280, 285 (D.C. 1987).  As such, District of Columbia courts generally speak in terms of partners and partnerships when discussing joint ventures. *See e.g. Fraser v. Gottfried*, 636 A.2d 430, n. 6 (D.C. App. 1994) (acknowledging that the relationship between the parties was more likely a joint venture than a "true partnership" but employing the terms "partner" and "partnership" for the sake of simplicity).  According to *Beckman v. Farmer*, 579 A.2d 618, 628 (D.C. App. 1990) – cited to by *Washington Inv. Partners of Del., LLC v. Securities House, K.S.C.C.*, 28 A.3d 566 (D.C. App. 2011) for the elements of a joint venture – though "the partnership relation has been variously

defined, traditionally it is formed 'when two or more competent persons [contract] to place their money, effects, labor, and skill or some or all of them, in lawful commerce or business, and to divide profit and bear the loss in certain proportions.'" (quoting *Georgia Casualty Co. v. Hoage*, 61 App. D.C. 195, 197, 59 F.2d 870, 872 (1932) (alteration in original)).

However, according to the *Beckman* court, none of the customary attributes of a partnership – i.e., profit and loss sharing and joint control over decision making – are conclusive because these can be changed by agreement of the parties. *Id.* at 627-628. Instead, the ultimate question is whether the parties intended to do the acts that would constitute a partnership, whether or not they intended to create a partnership. *Id.* at 627. Similarly, the standardized jury instruction for the District of Columbia for joint ventures does not focus on, or even contain, all of the "customary attributes of a partnership." Standardized Civil Jury Instruction 6.08 lists the elements *required* for a joint venture as follows:

    (1) That the group engaged in an activity to achieve a common goal;

    (2) That each group member had a common purpose or common interest in achieving the goal;

    (3) That there was an express or implied agreement among the members of the group; and

    (4) That under the agreement each member had the equal right to direct and control the [management of the enterprise].

    The joint venture or joint enterprise relationship does not arise accidentally. The members must have the intent to form the relationship. When a joint venture or enterprise exists, the law considers each member as acting for all other members. As a result, all of the members of a joint venture or enterprise are liable for the negligence of any one of the members.

Plaintiffs alleged sufficient facts to support each of these elements. Specifically, Plaintiffs alleged that "the law firms and attorneys who formed the PSC joined together for the common interest of representing nearly 5,000 petitioners" and that, as part of organizing and

presenting a series of "test cases" which could be used by all petitioners, the Defendants "worked together to complete discovery, hire and consult with expert witnesses, participate in meetings with the Vaccine Court," among other things.  [Complaint at ¶ 29]  This is clearly sufficient to show that the members had a common purpose and that they engaged in an activity to achieve a common goal.  Plaintiffs further alleged that the "PSC established an independent account into which PSC member law firms deposited funds for the payment of expenses deemed 'shared' or for the 'common benefit,'" that members participated in regular status conferences, and that members could not expend PSC funds without approval by the other members. [Complaint at ¶ 29]  Certainly, participation in joint activities, including status conferences and the deposit of funds for use by the group, is evidence supportive of – at a minimum – an implied agreement to join together for a common purpose.  Further, the requirement that expenditures be approved by other members is evidence that the members had an equal right to control of the enterprise.  Thus, Plaintiffs' Complaint sets forth sufficient facts to support a finding that the PSC was a joint venture pursuant to the law of the District of Columbia.

Defendants' arguments to the contrary are unpersuasive.  First, Kim asserts that the PSC was a "court-mandated means of achieving judicial economy, *not an agreement among the various members*," so there could not have been an express or implied agreement to carry out a single venture.  [Kim's Brief at 9 (emphasis in original)]  However, as the Vaccine Court's Autism General Order # 1 makes clear, the PSC was created based on a proposal put forward by the *petitioners' representatives* (the Defendants in this case), which also outlined the purpose of the committee.  *In re: Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder Various Petitioners v. Sec. of HHS*, 2002 WL 31696785 (Fed. Cl. 2002).  Autism General Order # 1 reads, in relevant part:

Accordingly, **petitioners' representatives in the advisory committee meetings have proposed a general procedure** by which the OSM could process the claims described above, both those already filed and those about to be filed. They propose that the OSM utilize a two-step procedure . . . . **They propose that a team of petitioners' lawyers be selected to represent the interests of all petitioners in these autism cases during the course of this general causation inquiry.** They propose that the proceeding begin with a lengthy period of discovery . . . followed by designation of experts for each side . . . . Subsequently, the general causation conclusions will be applied to the individual cases.

. . . .

First, the **OSM adopts the general approach to these cases suggested by the participants in the informal advisory committee**. . . . **As proposed, the OSM will authorize a team of attorneys to represent the interests of all petitioners** in these autism cases during the course of this general causation inquiry, which is officially entitled the "Omnibus Autism Proceeding." The inquiry will proceed as generally proposed by petitioners' attorneys . . . . Subsequently, the general causation conclusions will be applied to the individual cases.

. . . .

Representing the interests of petitioners in the Omnibus Autism Proceeding will be a Petitioners' Steering Committee. This committee will be comprised of counsel who are representing Program petitioners in autism cases. Currently, the vast majority of pending Program autism cases have been filed by a small number of law firms. **The OSM invited attorneys from those firms to participate in the informal advisory committee described above. Those counsel have organized the initial Petitioners' Steering Committee, whose members are set forth at Ex. D to this Order.** Other counsel who are interested in serving on the Steering Committee may contact the members of that committee to express their interest. The OSM believes that **membership on the Steering Committee should be determined by petitioners' counsel, interacting among themselves**. . . . In the unlikely event that disputes arise as to the Committee membership, the presiding special master shall be informed immediately and will resolve any issues.

*Id.* at *2-3 (italics in original) (emphasis added). In other words, the Vaccine Court created the PSC for the single purpose of representing petitioners during the general causation inquiry and did so based on the agreement of and proposal by petitioners' counsel. "Exhibit D" to General Autism Order #1, which lists the members of the advisory counsel who developed this proposal, includes, among others, John Kim (then of Gallagher, Lewis, Downey & Kim, now of Defendant John H. Kim) and Ronald Homer and Kevin Conway of Defendant Conway. Moreover, attorneys representing petitioners with autism in the Vaccine Court were not required to join the

PSC in order to utilize the results of the PSC's work in their own cases, and it appears that the PSC was not required to admit all of the firms who were interested in membership. *Id.* at *3, 6. It seems clear, then, that those firms who were members of the PSC were members by agreement.

Second, Kim argues that there was no agreement to share profits and/or losses. Assuming, *arguendo*, that this is required to prove a joint venture, Plaintiffs' have pled sufficient facts in support of this element. As noted above, Plaintiffs pled that the members of the PSC deposited funds into the PSC's account for joint expenses. In addition, Plaintiffs pled that the PSC members worked together to "jointly petition the Vaccine Court for the payment of their attorney fees and reimbursement of the costs expended in support of the PSC's common purpose." [Complaint at ¶ 29] Defendant Kim correctly notes that the Vaccine Court paid the members of the PSC for the value of the work they completed pursuant to federal statute and court order. However, it does not follow, as Kim suggests, that this means there was no sharing of profits and/or losses by the members. The Vaccine Court was not required to reimburse all of the costs expended by the PSC, and indeed it did not. *See King v. Sec'y HHS*, 2011 WL 5926126, *24 and n. 31 (finding that the significant amounts paid by the PSC to Drs. Hirsch and Young should not be reimbursed in any amount). Thus, with respect to those so-called shared costs that were not reimbursed by the Vaccine Court, the members of the PSC shared in the loss.

Furthermore, it is disingenuous to claim that awards of attorneys' fees do not qualify as profits. Law firms are frequently organized as partnerships – for which sharing of profits is required – and, importantly, if attorneys did not make a profit from the payment of their fees, it is safe to say that there would be far fewer attorneys than there are at present. That the fees were divided between the members of the PSC in proportion to the amount of work they did is not at all out of line with a partnership, where the presumption of equal distribution of profits can be

altered by agreement. *See e.g. Brown v. 1401 N.Y. Ave., Inc.*, 25 A.3d 912, 913-914 (2011); *Beckman*, 579 A.2d at 628 (referring to the agreement to divide profits and bear losses "in certain proportions"); *Singer v. Scher*, 761 F. Supp. 145 (D.D.C. 1991) (holding that both the common law and the UPA allow partners to set specific rules of their partnership); D.C. Code § 29-604.01(k) (allowing a difference in the ordinary course of business by agreement of the partners). Moreover, there is authority for treating attorneys jointly representing clients as joint venturers when the other characteristics of a joint venture are present. *See e.g. Thompson v. Hiter*, 356 Ill. App. 3d 574 (2005) (finding that an attorney and law firm were joint venturers for the purpose of one case where there was an agreement to share fees and each had a right to control and/or manage the case); 46 Am. Jur. 2d *Joint Ventures* § 50 (attorneys who jointly represent a client, even on a contingent fee basis, may be regarded as joint venturers when they share a common purpose and each have a right to control). Thus, Plaintiffs have sufficiently alleged that the members of the PSC shared profits and losses in certain proportions.

Finally, Defendant Kim argues that there was no joint control because the Vaccine Court specifically reserved for itself ultimate control over the PSC. This is simply incorrect. In Autism General Order #1, the Special Master wrote, "In the unlikely event that disputes arise *as to the Committee membership*, the presiding special master shall be informed immediately and will resolve any issues." *In re: Claims for Vaccine Injuries*, 2002 WL 31696785 at *3 (emphasis added). Reserving the power to resolve membership disputes – after specifically stating that membership should be determined by counsel themselves – is not at all the same as reserving "ultimate control." Nowhere in Autism General Order #1 is the Vaccine Court given the power to make any other decisions on behalf of the PSC or its members. Rather, as Plaintiffs alleged, the PSC and its members organized and executed its litigation strategy, entered into contracts,

opened a bank account, etc. based on the PSC's internal decision-making procedures, which were established by the voluntary members.

Plaintiff has pled sufficient facts to show that the PSC was a joint venture. While Defendants may dispute this categorization, that is not an argument to be decided on a motion to dismiss because the existence of a joint venture is an issue of fact. *See Beckman*, 579 A.2d at 628 ("Ultimately, then, whether a partnership exists is an issue of fact . . . ."); *Jonathan Woodner Co. v. Laufer*, 531 A.2d 280, 285 (D.C. 1987) ("The existence *vel non* of a joint venture is a factual issue properly reserved for the trial court as trier of fact . . . ."). Thus, Defendants' Motions to Dismiss with regard to breach of contract and joint and several liability for professional negligence must be denied.

## 2.  Plaintiffs Have Alleged Sufficient Facts to Prove a Joint Venture By Estoppel

Even if Plaintiffs have not pled sufficient facts to establish that the PSC was a joint venture in fact, they have pled sufficient facts to establish that Defendants' actions created a joint venture by estoppel. As noted above, joint ventures are generally governed by partnership law. The District of Columbia recognizes the doctrine of partnership by estoppel. *See McGrath v. McGrath*, 55 App. D.C. 221, 298-299 (1925) ("Having thus been held out to be a partner, and having participated in the business of the concern, and in the settlement and distribution of its assets, he is now estopped to deny partnership for the mere purpose of avoiding the enforcement of a lawful judgment against him . . . ."); *Smith v. Lancaster*, 37 App. D.C. 25, 28 (D.C. Cir. 1911) ("The conduct of the parties in advertising and using a partnership name was sufficient to make them partners by estoppel as to third persons dealing with them in the faith of such representations, yet, as between themselves, something more is necessary.").

Specifically, D.C. Code § 29-603.08(a) outlines the liability of one who is not a partner but is held out to a third party as such:

> If a person, by words or conduct, purports to be a partner, or consents to being represented by another as a partner, in a partnership or with one or more persons not partners, the purported partner shall be liable to a person to whom the representation is made, if that person, relying on the representation, enters into a transaction with the actual or purported partnership. If the representation, either by the purported partner or by a person with the purported partner's consent, is made in a public manner, the purported partner shall be liable to a person that relies upon the purported partnership even if the purported partner is not aware of being held out as a partner to the claimant. If partnership liability results, the purported partner shall be liable with respect to that liability as if the purported partner were a partner.

Essentially, by acting as a partnership or joint venture, the members of an organization are estopped from denying the existence of the partnership or joint venture for the purposes of liability to a third party who relied on those actions and transacted with the purported partnership or joint venture.  And, where the representation of partnership or joint venture is made publicly and with consent, the purported partner is estopped from denying the existence of the partnership or joint venture, even if he is unaware that the representation was ever made to the third party.

Moreover, when a party knows that he has been held out as a partner or member of a nonexistent partnership or joint venture and takes no steps to disavow that representation, he has impliedly consented to the representation and will be held liable as a partner or member. *See Orndorff v. Cohen*, 62 A.2d 794, 795 (D.C. Dec. 14, 1948) ("When liability as a partner must be predicated, if at all, upon the fact that one has been held out by another as a partner, it must . . . appear that the person so held out consented in fact to the holding out, or when the fact of the holding out came to his knowledge, *negligently failed to assert the nonexistence of the partnership in time to prevent others from relying thereon*. The knowledge of an *assent to the*

*holding out may be inferred* from appropriate circumstances.") (emphasis added) (internal citations omitted).

In this case, both the 2003 Agreement and the 2004 Amendment thereto, incorporated into Plaintiffs' Complaint, were signed by individuals in their capacity as representatives of the PSC. While Plaintiffs alleged that all of the Defendants were members of the PSC [Complaint ¶¶ 4-11], Plaintiffs have since learned that Defendant Kim was not only a founding member of the PSC but also served as co-chair of the PSC's Executive Committee during the period that both contracts were signed. [*See Autism Update And Order – September 24, 2003* (listing Kim as co-chair), Exhibit C; *Motion to Substitute PSC Committee Member* (filed January 14, 2008, replacing Kim as co-chair), Exhibit D]. And, at least at the time the 2003 Agreement was signed, Kim was a member of the PSC's Expert Subcommittee, as was Sheila Bjorklund, an attorney with Defendant Lommen, and Thao Ho, an attorney with Defendant Williams Kherkher.[1]   [*See* Exhibit C]  Bjorklund and Ho were also members of the PSC's Executive Committee during the period that both contracts were signed. [*See* Exhibit C; *Notice Re Roster of Executive Committee of PSC*, filed March 9, 2007, Exhibit E.][2]  Plaintiffs have further learned that the Executive Committee, of which Kim, Lommen, and Williams Kherkher were a part of, was responsible for coordinating the prosecution of the general causation causes and delegating tasks to PSC members.[3]

---

[1] No other subcommittee rosters appear to have been filed after September 24, 2003, so it is not clear when or if Kim's, Bjorkland's or Ho's membership in this committee ended.

[2] Although Thao Ho does not appear on the Executive Committee roster of March 2007, there appear to be no intervening rosters to determine when Ho ceased to be a member of that committee, but time records for Williams Kherker filed with the Vaccine Court indicate Ho continued to work with the PSC and participate in meetings through 2006.

[3] Representatives of Defendant Conway appear on some but not all of the rosters for the Executive Committee, though Plaintiffs believe that Defendant Conway was aware of and acquiesced in the contract between the Plaintiffs and the PSC.

In other words, in 2003, it was represented to Dr. Geier that he was entering into a contract with an entity called the PSC, which was comprised of certain law firms, including Defendants, for the purpose of aiding the prosecution of certain causation theories in the Vaccine Court. [Exhibit A, ¶ 2]  It was further represented that the organization, through its members, would be able to pay on the contract.  [*Id.*]  Indeed, the PSC paid many (though not all) of the invoices submitted by Dr. Geier pursuant to the 2003 Agreement.  [*Id.*]  In 2004, relying on those same representations and the prior course of conduct by the PSC as an entity, Plaintiffs signed the 2004 Amendment.  [*Id.*]  As evidenced above, Defendants had been publicly held out as members of this organization and, as members of the Expert Subcommittee and Executive Committee, Defendants knew that the PSC had contracted with the Geiers.  [*Id.*]  However, at no time did any of the Defendants assert the nonexistence of the joint venture or their membership in it.  [*Id.*]  As such, they are estopped to deny its existence now.

## B.  This Court Has Specific Jurisdiction Over The Defendant Law Firms.

In a diversity case, such as this one, the federal district court's personal jurisdiction over the defendant is coextensive with that of a District of Columbia court.  *See Helmer v. Doletskaya,* 393 F.3d 201, 205 (D.C.Cir. 2004).  To satisfy specific jurisdiction in the District of Columbia, the court must find that (1) jurisdiction over the defendant is authorized by the District of Columbia's long-arm statute, D.C. Code § 13-423; and (2) the exercise of that jurisdiction satisfies the federal requirements of constitutional due process.  *Kopff v. Battaglia,* 425 F.Supp.2d 76, 81 (D.D.C. 2006).

In this case, the District of Columbia's long-arm statute and due process authorize specific jurisdiction over the Defendants.  Specifically, the long-arm statute, D.C. Code § 13-423, reads in pertinent part (emphasis added):

(a) A District of Columbia court may exercise personal jurisdiction over a person, **who acts directly or by an agent**, as to a claim for relief arising from the person's

(1) transacting any business in the District of Columbia;
….
(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
….
(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

With regard to Section 13-423(a)(1), courts have held that the "transacting any business" provision of the "long-arm statute" is coextensive with due process. *See Smith v. Jenkins,* 452 A.2d 333 (D.C. App. 1982). As a result of this congruence, in order to establish that this Court has specific jurisdiction under Section 13–423(a)(1), a plaintiff must demonstrate that (1) the defendant [or his agent] transacted business in the District of Columbia, (2) the cause of action arose from the business transacted in the District of Columbia, and (3) the "defendant [or his agent] had minimum contacts with the District of Columbia such that the Court's exercise of personal jurisdiction would not offend 'traditional notions of fair play and substantial justice.' " *Id.* Section 13-423(a)(1) applies to both breach of contract and tortious injuries that arise from transacting business in the District of Columbia. *See McDaniel v. Armstrong World Industries,* 603 F.Supp. 1337 (D.D.C. 1985) (holding that courts have found that both contract claims and tort claims can arise from the transaction of business and can form the basis for personal jurisdiction under Section 13-423(a)(1)).

As the Geiers will establish in this brief, the Defendant law firms are subject to specific personal jurisdiction in the District of Columbia due to the their own transaction of business with regard to the Geiers in the forum state. Additionally, the Defendant law firms, as members of the PSC, are subject to specific personal jurisdiction in this forum based on the PSC's minimum contacts within this forum. Further, the Defendant law firms are subject to specific personal

jurisdiction in this forum because of the minimum contacts of their co-joint venturers.  Finally, each of the Defendant law firms is subject to general jurisdiction in this forum due to their regular and continuous contacts as attorneys in the District of Columbia.

**1.  The Defendant Law Firms Are Subject to Specific Personal Jurisdiction in this Forum Based on Their Own Minimum Contacts.**

Each of the Defendant law firms transacted business in the District of Columbia with regard to the Geiers.  The facts are undisputed that the Defendants in this case held significant roles in the PSC.  At the time the Geiers began working for the PSC in 2003 and entered into the first contract with the PSC, the PSC's executive committee included (among other members) the defendants in this case - John Kim of the John Kim Law Firm, Shelia Bjorklund of Lommen, and Thao Ho of Kherkher.[4]  The executive committee also included Michael Williams and Kathleen Dailey from the Williams Love law firm who signed the contracts between the PSC and the Geiers.  [*See* 2003 Executive Committee list, Exhibit F] The members of the Executive Committee determined that the PSC would enter into the 2003 Agreement and the 2004 Amendment between the PSC and the Geiers which contemplated that Dr. Geier would testify as an expert in the District of Columbia.  Indeed, the PSC listed Dr. Geier as a witness for the PSC. [Witness List, Exhibit G]  Later, the PSC Executive Committee conferred regarding which of the Geiers' fees should be submitted for payment to the District of Columbia court pursuant to the PSC's contractual obligation to "help" the Geiers' get paid.  Sheila Bjorklund of Lommen and Kevin Conway of Defendant Conway were among the PSC executive committee members participating in these actions as evidenced by their inclusion on the July 30, 2008 letter from the

---

[4] For purposes of assessing personal jurisdiction, it is not relevant that the claims arise from the defendant's business transaction in the forum before the filing of the lawsuit.  Rather, the court looks to whether the claim is connected to the defendant's contacts with the forum, regardless of the timing.  *See McDaniel*, 603 F.Supp. 1345 (D.D.C. 1985) (reasoning that the timing of the lawsuit does not alter the fact that the claim being brought is intimately connected with the forum since the injury arose out of the defendant's transaction of business in the forum).

PSC to the Geiers. [July 30, 2008, Letter to the Geiers re: fees, Exhibit H] Thereafter, the Williams Love law firm, on behalf of the PSC and its Executive Committee, prepared and submitted fee applications in the District of Columbia for the Geiers, negotiated with the Department of Justice to attempt to reach a settlement on the Geiers' fees, and submitted numerous briefs and appeals on behalf of the Geiers in an effort to receive a fee award from the Vaccine Court located in the District of Columbia court. [*See* Exhibit A, ¶ 12; Exhibit B ¶ 7]

Accordingly, each of the Defendant law firms in this case had purposeful, deliberate contacts with the District of Columbia with regard to their contractual relationship with the Geiers and their attorney-client relationship with the Geiers. *See Jackson v. Loews Washington Cinemas, Inc*., 944 A.2d 1088 (D.D.C. 2008) (a small amount of business activity in a jurisdiction, even if just a single act, is enough to establish minimum contacts so long as the contact was voluntary and deliberate). Given their purposeful and deliberate contacts in contracting to accept services *from the Geiers* in the District of Columbia and to perform services *for the Geiers* in the District of Columbia, there is nothing to suggest that a substantial injustice would occur by maintaining this lawsuit in this forum. Accordingly, the Defendants in this action are subject to specific jurisdiction in the District of Columbia based on their own minimum contacts.

**2. The District of Columbia Contacts of the PSC Are Imputed to the PSC Member Firms.**

There can be no genuine dispute that the PSC is subject to jurisdiction in the District of Columbia. As established above, the PSC was clearly a joint venture established in the District of Columbia at the recommendation and request of the Defendants in this case. [General Order #1, attached hereto as Exhibit I] The PSC's contacts with the District of Columbia are numerous and undisputed. The PSC's purpose was to litigate test cases in District of Columbia, the PSC

rented office space in the District of Columbia, the PSC litigated to trial at least six autism test cases in the District of Columbia, and the PSC held numerous meetings in the District of Columbia.  [Defendants' Billing Records, Exhibits L and O; Autism Update and Order, Exhibit C]  Furthermore, membership in the PSC was voluntary – a law firm could decide to join the PSC or could opt to pursue cases separately.  [Exhibit I]  The PSC also determined that it would enter into contracts with certain expert witnesses, including the Geiers, to further the PSC's litigation efforts in the District of Columbia.  [Williams and Powers' Responses to Plaintiffs' Interrogatories, Nos. 9-11,  Exhibit J]  Clearly, under these facts, the PSC is subject to specific jurisdiction in the District of Columbia.  *See Jackson*, 944 A.2d 1088 (D.D.C. 2008) (a small amount of business activity in a jurisdiction, even if just a single act, is enough to establish minimum contacts so long as the contact was voluntary and deliberate).  Further, the PSC formed an attorney-client relationship with the Geiers to support the Geiers' request for fees from the Vaccine Court, which eventually led to the acts and omissions underlying the Geiers' malpractice claim.  Therefore, the PSC members – the Defendant law firms in this case – are necessarily subject to specific jurisdiction in the District of Columbia as well.

Pursuant to District of Columbia law, the acts of the partnership – and/or its partners – can bind all of the general partners; in other words, the partnership is an agent for all of the general partners.[5]  *See* D.C. Code § 29-603.01 ("(1) Each partner shall be an agent of the partnership for the purpose of its business. (2) An act of a partner, including the execution of an instrument in the partnership name . . . shall bind the partnership"); D.C. Code § 29-603.06(a) ("all partners shall be liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law"); *see also Phillips v. U.S.*, 61 App. D.C. 206, 59 F.2d 881 (1932) (each partner is not only agent for partnership, but agent for other

---

[5]        As previously addressed, the principals of partnership law apply to joint ventures.

partner); *Pottash Bros. v. Burnet*, 60 App. D.C. 167, 50 F.2d 317 (1931) (during continuance of partnership, act of one partner within scope of business binds all partners).  In the context of personal jurisdiction, courts have determined that where the partnership acts as the partners' agent, the partnership's contacts with the forum state may be imputed to the partners.  *See Basciano v. L&R Auto Parks, Inc.,* 2011 WL 6372455 (E.D.Pa. 2011) (finding that because the court had personal jurisdiction over the partnership, it could assert jurisdiction over the partners); *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 95 n.1 (3rd Cir. 2004) (holding that the contact of any one individual partner is attributable to all the partners for purposes of personal jurisdiction); *In re Phar-Mor, Inc., Secs. Litig.,* 875 F.Supp. 277, 281 (W.D.Pa. 1994) (exerting personal jurisdiction over the partners where the partnership conducted business in Pennsylvania); *Intercont'l Leasing, Inc. v. Anderson*, 410 F.2d 303, 305 (10th Cir. 1969) ("Through the instrumentality of the partnership, the individual partners purposefully availed themselves of the privilege of conducting business activities in [the forum state]….  This is enough to invoke the long-arm statute and to subject them to personal jurisdiction."); *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 931 F.Supp. 592, 594-95 (N.D.Ill. 1996) (holding that the court had personal jurisdiction over the partners or joint venturers because the court had jurisdiction over the partnership or joint venture).

The facts are undisputed that the Defendants in this case were members of the PSC joint venture, and in fact, held significant roles in the PSC as members of the Executive Committee that made decisions regarding the hiring of the Geiers and the Geiers' fee requests.  As outlined above, there are numerous facts which make it clear that the PSC was a joint venture transacting business and specifically with the Geiers in the District of Columbia.  Further, the facts establish that the PSC formed an attorney-client relationship with the Geiers and filed pleadings and made

arguments on behalf of the Geiers in the forum state.  Additionally, there are numerous facts to establish that the Defendants in this matter were active members of the PSC who had knowledge of the contract with the Geiers, the attorney-client relationship, and that the Defendants in this case participated in decisions with regard to the Geiers.

Furthermore, the maintenance of this lawsuit in the forum state "does not offend 'traditional notions of fair play and substantial justice.' " *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980), quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).  In this regard, the court determines whether the defendant's "conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. 297, 292.  There is no reason that the dictates of "fair play and substantial justice" prevent this Court from exercising jurisdiction the members of the PSC given the active role the Defendants in this case played in the PSC and the numerous contacts with this forum.  Accordingly, because the PSC is subject to personal jurisdiction in this Court and its member law firms as joint venturers are likewise subject to personal jurisdiction, Defendants' Motions to Dismiss for lack of personal jurisdiction should be denied.

3.  **The District of Columbia Contacts of the Williams Love Law Firm Are Imputed to the PSC Member Firms.**

The Defendant law firms in this case are also subject to personal jurisdiction in this Court because of the contacts of Williams Love with this forum as joint venturers. Specifically, under the "joint venture" personal jurisdiction theory, the minimum contacts of one joint venturer are attributable to the other joint venturers such that personal jurisdiction over one means personal jurisdiction over the other venturers.  In *Daynard v. Ness, Motley, et. al.,* 290 F.3d 42 (1st Cir. 2002), a case strikingly similar to this one, the First Circuit considered whether a law firm could be subject to personal jurisdiction based on the forum contacts of another law firm where the two

law firms worked together in multi-jurisdictional tobacco litigation and neither law firm was based in the forum state.  The First Circuit held that personal jurisdiction existed.

In *Daynard*, a Massachusetts law professor brought a claim in Massachusetts federal court to recover his fees against the law firms he worked for as an expert in nationwide tobacco cases.  It was undisputed that a partner in the Mississippi based law firm of Ness Motley traveled to Massachusetts to meet with the expert and retain his services.  *Id.* at 46.  The expert alleged that at the time of this meeting Ness Motley and a South Carolina based law firm, Scruggs Millette, were engaged in a tobacco litigation joint venture and that he understood Ness Motley was acting to advance the objectives of both the firms in the litigation.  *Id.*  After he was retained, the expert met with Ness Motley outside of the forum state to discuss legal theories of the case and continued to communicate regularly with Ness Motley by phone and fax providing advice on litigation related matters.  The expert also had communications with the Scruggs Millette law firm as needed.

Initially, Ness Motley compensated the expert based on hourly fees for services rendered.  However, the expert alleged that those payments ended when Ness Motley and the expert agreed that the expert would defer his fees until the court awarded attorney fees which would be shared with the expert.  *Id.*  There was no dispute that the expert had never received payment from Scruggs Millette – rather, all payments were made by Ness Motley.  After the tobacco litigation cases were settled outside of the forum state several years later, both Scruggs Millette and Ness Motley denied the deferred fee arrangement and refused to compensate the expert for his time.  *Id.* at 48.  The law firms also downplayed the expert's role in the case and denied that they owed him any money.  *Id.*

After the expert filed suit in Massachusetts, Ness Motley conceded personal jurisdiction, but Scruggs Millette moved to dismiss the complaint for lack of personal jurisdiction. *Id.* at 49. Scruggs Millette asserted that it had never agreed to share any fees with the expert, that the expert merely worked as a volunteer to promote his own agenda, and that only Ness Motley compensated the expert as a consultant on a limited basis. *Id.* Scruggs Millette argued that it had no offices, bank accounts or real estate in Massachusetts, and that none of the members of the Scruggs Millette firm practiced law in Massachusetts. Further, Scruggs Millette denied that a joint venture existed and denied knowledge of the expert's meetings with Ness Motley. *Id.*

The district court dismissed the case finding that it lacked personal jurisdiction over Scruggs Millette. However, the First Circuit reversed the district court finding personal jurisdiction did exist. In reaching this decision, the Court analyzed "whether any of [Ness Motley's] contacts [with the forum state] [could] be imputed to [Scruggs Millette] for purposes of establishing minimum contacts.[6] *Id.* at 52. The Court noted that the expert believed the defendants were acting as a joint venture in hiring him to advance the law firms' combined efforts in the nationwide tobacco litigation. *Id.* at 53. The Court also reasoned that whether a joint venture, partnership or other particular agency relationship existed between the two law firms was immaterial. Rather, where the law firms had held themselves out and were acting as a joint venture or other agency relationship, it was consistent with due process to impute Ness Motley's contacts with the forum state to Scruggs Millette. *Id.* at 56-57. Furthermore, Scruggs Millette ratified the hiring of the expert by communicating with him about the tobacco litigation and accepting the benefits of the expert's hiring. *Id.* at 59.

---

[6] The focus of the First Circuit's analysis in answering this question was whether Scruggs Millette acted "directly or through an agent" to "transact business" in Massachusetts as required by Massachusetts' long-arm statute which was to be interpreted to the limits allowed by the US Constitution. *Id.* at 52. The District of Columbia follows this same analysis.

After finding that the contacts could be imputed to Scruggs Millette, the Court considered whether the sum of the imputed contacts permitted the exercise of personal jurisdiction over Scruggs Millette consistent with the U.S. Constitution – i.e., does asserting jurisdiction comport with the notions of fair play and substantial justice? *Id.* at 52-53 and 60. Toward this end, the Court concluded that Ness Motley's continued relationship with the expert and Ness Motley's contacts in communicating with the expert as attributed to Scruggs Motley established purposeful activity.

This case is similar to the *Daynard* case in many respects. The Geiers have alleged that the Defendant law firms were members of a joint venture – the PSC – that was formed in the District of Columbia, transacted business in the District of Columbia, and acted as counsel for the Geiers in the District of Columbia. The law firm of Williams Love, acting in furtherance of the PSC's District of Columbia litigation efforts, entered into a contractual relationship with the Geiers to act as experts in the autism cases. The contract contemplated that Dr. Geier would testify as an expert in the District of Columbia, and he was listed as a witness for the PSC. Pursuant to this contract with the PSC, the Geiers published an article associating vaccines with autism. Williams Love submitted this article into evidence during litigation before the Vaccine Court. Indeed, Williams Love, on behalf of the PSC, sought an extension of time in the case to allow the Geiers more time to complete their research. Further, the Williams Love law firm filed pleadings on behalf of the Geiers' fee requests in the District of Columbia, attempted to negotiate a settlement of the Geiers' fees with parties in the District of Columbia, and pursued an appeal for the Geiers in the District of Columbia – all in furtherance of the contract between the PSC and the Geiers. [*See* Exhibit A, ¶ 12; Exhibit B, ¶ 7] Additionally, the Geiers have alleged that Michael Williams and Tom Powers of the Williams Love law firm committed malpractice in

their representation of the Geiers on behalf of the PSC in the District of Columbia.    Quite clearly, Williams Love engaged in sufficient contacts with the District of Columbia in furtherance of the contract between the PSC and the Geiers to justify the exercise of personal jurisdiction over Defendants.  As a joint venturer, Williams Love's contacts with the forum state are imputed to their other joint venturers to establish personal jurisdiction. *See also Certain Underwriters at Lloyd's, London v. Garmin International Inc.,* 2012 WL 1158849 (D.Kan. April 6, 2012) ("Under the "joint venture theory," the minimum contacts of one joint venturer are attributable to the other joint venturers such that personal jurisdiction over one means personal jurisdiction over the other venturers."); *Aigner v. Bell Helicopters, Inc.,* 86 F.R.D. 532, 540-41 (N.D. Ill. 1980) (the forum contacts of one joint venturer may be imputed to another to establish personal jurisdiction over all joint venturers).

Furthermore, the maintenance of this lawsuit in the forum state does not offend traditional notions of fair play and substantial justice.  As established above, the Defendant law firms in this case played active roles in the PSC and the District of Columbia litigation. Additionally, the Defendant law firms were aware of Williams Love's representation of the Geiers on behalf of the PSC and the contractual obligations with the Geiers created on behalf of the PSC.  Thus, this Court has personal jurisdiction over the Defendants in this matter, and Defendants' Motions to Dismiss based on personal jurisdiction should be dismissed.

**4.  The Contract Has A Substantial Connection to the District of Columbia.**

Several of the Defendant law firms in this action assert that this Court cannot exercise personal jurisdiction over them because the contract between the PSC and the Geiers is not "substantially connected" to the District of Columbia.  The Defendants primarily rely on the cases of *Novak-Canzeri v. Turki Abdul Alziz Al Saud,* 864 F.Supp. 203, 207 (D.D.C. 1994) and

*Exponential Biotherapies, Inc. v. Houthoff Buruma, N.V.,* 638 F.Supp. 2d 1 (D.D.C. 2009), to support this proposition.   However, in both *Novak-Canzeri and Exponential*, there were facts to establish that the contract was performed in the forum state.  Here, the Geiers have established such facts and, if permitted by the Court, will amend the Complaint to make those facts clear.

Specifically, in this case, both the written contract and many of the actions taken in performing the contract occurred in the District of Columbia.  The 2004 Amendment included the following pertinent language establishing a connection to the District of Columbia:

> **The Petitioners' Steering Committee** appointed by the Special Master in charge of the Omnibus Autism proceedings **in the NVICP** is pleased to retain Dr. Mark Geier and David Geier as consultants **and potentially as testifying experts** on issues…
> Expert fees deferred.  The Geiers understand and agree that they will not be paid for their time of this project until the Vaccine Court has approved their fees, which may not be for two or more years.  They are not working on a contingency fee basis, but on a deferred fee basis.  **The PSC will support them in their fee petition** and will help to get the Geiers paid fairly and fully at the appropriate time…
> …The Geiers are to get written approval in advance for any trips outside of Maryland or **the District of Columbia**…

Accordingly, the written contract between the PSC and the Geiers contemplated that the Geiers would testify as experts in the autism litigation proceeding in the District of Columbia. The contract further contemplated (according to the Defendants' own construction) that the PSC would support the Geiers in filing fee petitions in the District of Columbia.  Furthermore, the contract contemplated that the Geiers would need to make frequent trips to the District of Columbia in performing the contract, such that the Geiers did not require permission for those trips.  [Exhibit A, ¶ 21; Exhibit B, ¶ 16]  Additionally, the PSC did in fact file multiple briefs in the District of Columbia on behalf of the Geiers', negotiated with parties in the District of Columbia on behalf of the Geiers, and pursued appeals from the Vaccine Court's denial of the vast majority of the fee petition relating to the Geiers' invoices.  Thus, there can be no doubt that the contract had a substantial connection to this forum.

**5.  The Tortious Injury and Acts Occurred in the District of Columbia.**

Relying on the District of Columbia's long arm statute, Section 13-423(a)(4), Defendant Conway asserts that this Court cannot assert personal jurisdiction over the Defendants in this action because the Geiers were not injured in the District of Columbia by acts or omissions outside of the District of Columbia.   Defendants' arguments demonstrate that they do not understand the Geiers' assertions.

First, as explained in detail above, this Court can assert specific personal jurisdiction over the Defendants in this case for either the Geiers' contract or tort claims based on Section 13-423(a)(1), as the Defendants were transacting business with regard to the Geiers – either based on their own contacts, the contacts of the PSC, or the contacts of Williams Love law firm. Second, to the extent the Geiers rely on any other section of the long-arm statute, the Geiers rely on Section 13-423(a)(3) – not (a)(4) as suggested by Conway Homer.    This section of the long-arm statute allows the Court to assert jurisdiction where the defendants cause "tortious injury in the District of Columbia by an act or omission in the District of Columbia."   Here, the Geiers have alleged that the Defendants actions with regard to malpractice occurred in the District of Columbia when the Defendants failed to file adequate briefs, make adequate arguments to the vaccine court on behalf of the Geiers, and failed to appropriately negotiate a settlement for the Geiers or include them in such negotiations.  [Exhibit A, ¶ 12; Exhibit B, ¶ 7]  All of these actions occurred in the District of Columbia and injured the Geiers in the Vaccine Court because they were unable to obtain a favorable ruling.

In any event, if the Court finds that it is proper to exercise personal jurisdiction over the Defendants on one claim asserted by the Geiers, the Court has discretion to exercise personal jurisdiction over the Defendants for all other claims that arise out of a common nucleus of

26

operative fact, even if the Defendants would not be subject to personal jurisdiction for those claims otherwise. This exercise of pendant personal jurisdiction over a defendant already properly in the forum is generally preferential to piecemeal litigation, both for the convenience of the parties and the resources of the courts. *See Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1 (2010); *Sisso v. Islamic Rep. of Iran*, 448 F. Supp. 2d 76 (2006); *Poling v. Farrah*, 131 F. Supp. 2d 191 (2001); *Oetiker v. Jurid Werke, G.m.b.H*, 556 F.2d 1 (1977). Because the Geiers' claims all share a common nucleus of facts[7] with the Geiers' breach of contract claims where the Court clearly has personal jurisdiction over the Defendants, any due process concerns are satisfied because the Defendants have already been "justifiably hauled in to defend against the latter." *Wultz*, 755 F. Supp. 2d at 36 (citing 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1069.7). Accordingly, this Court can find that it has personal jurisdiction over either the contract claim or the tort claims or both, and still exercise personal jurisdiction over the Defendants for purposes of the entire case.

**6. The Parties Have Already Litigated that the Forum Selection Clause of The Contract Has No Force and Effect.**

Defendant Lommen asserts that this Court cannot exercise personal jurisdiction over it because one of the contracts in dispute contains a forum selection clause choosing Maryland as the forum state. Lommen's position is directly at odds with its position in the previous Maryland litigation in which it argued that the forum selection clause was not binding. Indeed, Lommen won this argument before the Maryland court – hence, the instance case was filed.

The District of Columbia law is clear that the concept of "collateral estoppel" precludes the relitigation of an issue of law or fact already decided between the parties. As stated by the court in *Ali Baba Co., Inc. v. WILCO, Inc.,* 482 A.2d 418, 421 (D.C.App. 1984), "When an issue

---

[7] All of the Geiers' claims, including professional negligence/malpractice, stem from the inducement, performance, and breach of the 2003 Agreement and the 2004 Amendment thereto.

of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."

In the prior Maryland proceeding between the Geiers and the Defendants in this case, the Defendants disputed the legal validity and enforceability of the Maryland forum selection clause in the 2004 Amendment between the PSC and the Geiers. The Defendants in this case were all dismissed by the Maryland court after the Maryland court found that the forum selection clause did not establish personal jurisdiction in Maryland over Lommen and the other Defendants in this D.C. lawsuit. [*See* Judgment, Exhibit K] Since the issue of the legal effect of the forum selection clause was fully litigated before the Maryland court and resulted in a final order dismissing the Maryland lawsuit for lack of personal jurisdiction against the Defendants in this case, the Defendants are now estopped from litigating the validity of the forum selection clause before this Court. *See Harnett v. Washington Harbour Condominium Unit Owner's Assoc.*, ___ A.3d ____ (D.C.App. July 19, 2012) (holding that prior proceeding in which principal of condominium owner challenged issuance by zoning board of building permit to condominium owners' association to create new parking spaces collaterally estopped principal and owner from litigating claim that new parking spaces did not comply with the District's zoning laws and were dangerous and unsafe). Therefore, the forum selection clause in the 2004 Amendment is not a proper basis on which this Court may dismiss for lack of personal jurisdiction.

## 7. The "Government Contacts" Doctrine Is Inapplicable to This Case.

Defendant Williams Kherkher incorrectly asserts that the "government contacts" doctrine precludes a finding of personal jurisdiction over the Defendants. Williams Kherkher concedes that the "government contacts" doctrine does *not* apply where a client is suing his lawyer for

malpractice arising out of government contacts on behalf of the client in the District of Columbia. However, Williams Kherkher asserts that because it did not "directly" represent the Geiers, this exception should not apply. Contrary to Williams Kherkher's assertions, the PSC – and therefore, each of its members – agreed contractually to represent the Geiers in the vaccine court "to help" them get their fees as stated in the contract. Thereafter, the PSC assigned Michael Williams and Tom Powers of the Williams Love law firm to undertake this representation by filing fee applications for the Geiers' benefit, negotiating for the Geiers, and challenging the vaccine court's fee ruling for the Geiers. Indeed, members of the executive committee including Ms. Bjorkland from Lommen, Thao Ho from Williams Kherkher, and John Kim, conferred to determine which of the Geiers' fees would be submitted to the vaccine court for payment. [Exhibit H] The Geiers now allege that the PSC and its members negligent in this representation. Given these undisputed facts, it is clear that the PSC and its member law firms had an attorney-client relationship as alleged by the Geiers that forms the basis for this lawsuit, and that for this reason the government contacts doctrine does not bar personal jurisdiction in this case. *See Lex Tex Ltd. v. Skillman*, 579 A.2d 244 (D.C. 1990) (holding that law firm that represented client in proceedings before United States Patent Office "transacted business" in District of Columbia, and could not invoke "government contacts" doctrine to prevent court from exercising personal jurisdiction). Furthermore, the government contacts doctrine would not apply to Williams Kherker or any other Defendant simply because they did not perform certain acts themselves. *See id.* (court exercised jurisdiction over attorney *and* the partners of his law firm). Finally, because the Court has personal jurisdiction over Defendants for one claim, it may assert personal jurisdiction over Defendants for all the claims. *See Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1 (D.C. 2010) and cases regarding pendent personal jurisdiction cited above.

**C.  This Court Has General Jurisdiction Over Each of the Defendant Law Firms.**

This Court may assert general jurisdiction over each of the Defendant law firms based on their continuous and systematic contacts within the District of Columbia.  Based on the billing records submitted by the law firms to the Vaccine Court, it is evident that the Defendants in this case made frequent trips to conduct PSC business or attend non-PSC related seminars in the District of Columbia.  Further, many of the Defendant law firms in this matter hold themselves out to the public as "vaccine litigators" in the District of Columbia.

Williams Kherkher's expense records indicate that even before 2003 when the Geiers began working as consulting experts for the PSC and through 2008, a lawyer or lawyers from Williams Kherkher flew to the District of Columbia for meetings with the PSC or co-counsel, attended seminars, completed document reviews, or conducted research in January 2002, February 2002, April 2002, May 2002, June 2002, September 2002, November 2002, December 2002, January 2003, February 2003, March 2003, May 2003, June 2003, February 2004, March 2004, April 2004, October 2004, November 2004, and October 2006.  [*See* Williams Kherkher Expense Submission, Exhibit L]  Furthermore, the Williams Kherkher law firm currently holds itself out as being "committed to" litigating vaccine cases on behalf of families the District of Columbia vaccine court.  [*See* Article from Williams Kherkher Website, Exhibit M]

Defendant John Kim represents himself and his law firm as being involved in proposed legislation surrounding the NVICP in Washington, D.C.  [*See* John H. Kim website article, Exhibit N]  Furthermore, Defendant John Kim's billing records indicate that he attended meetings and conferences in the District of Columbia in April 2002, May 2002, June 2002, November 2002, December 2002, January 2003, February 2003, June 2003, August 2003,

October 2003, February 2004, April 2004, August 2004, September 2004, November 2004, July 2005, and October 2006.  [*See* John Kim's billing records, Exhibit O]

Lommen and attorney Sheila Bjorklund represent themselves on their website as vaccine litigators in the District of Columbia vaccine court.  [Lommen website articles, Exhibit P] Likewise, Conway represents itself as the "most experienced vaccine injury law firm" and that the law firm "is solely dedicated" to vaccine injury cases.  [Conway website articles, Exhibit Q]

Accordingly, this Court may assert general jurisdiction over each of the Defendant law firms based on their continuous and systematic contacts within the District of Columbia as shown above.  However, if this Court finds that it lacks enough evidence to determine whether it may exercise general or specific personal jurisdiction over any particular Defendant, the Geiers seek relief to complete jurisdictional discovery prior to the Court's ruling.  Furthermore, if this Court finds that the Geiers have not sufficiently pled personal jurisdiction in the Complaint, the Geiers seek leave to amend the Complaint to assert the facts as set forth in this brief and the supporting evidence.  The Court has the discretion to allow such an amendment, and the Federal Rules of Civil Procedure state that such amendments shall be freely given.  Fed.R.Civ.P. 15(a).

**D.  Defendants May Be Held Liable on the Contract Even If the PSC Lacked Capacity to Enter Into Contracts**

Although Plaintiffs maintain that the PSC is a joint venture, they have pled, in the alternative, that the PSC was a nonexistent entity without the capacity to contract.  This theory is the basis for Plaintiffs' Counts One, Three, Four, and Seven.  Although Lommen alone argues that the PSC had the capacity to enter into the contract at issue, both Lommen and Kim assert that, if the PSC did lack the capacity to contract, they would still not be liable to the Plaintiffs on these counts.  Plaintiffs disagree.

**1.  The PSC Was A Non-Entity, Incapable of Entering Into Contracts**

Citing to language in Autism General Order # 1, Lommen argues that the Vaccine Court gave the PSC the explicit authority to "retain experts," i.e. to enter into contracts with them. However, the Order only allows the PSC to *designate* expert witnesses. It does not follow that the Vaccine Court specifically endowed the PSC with the legal capacity to enter into contracts. Indeed, Lommen has cited no authority to support its theory that the Vaccine Court has the power to breathe legal capacity into a non-entity. Lommen also asserts that use of committees such as the PSC to make agreements and hire experts is quite common in multi-district litigation, but Lommen fails to properly support this assertion. [Lommen Brief at pg. 13]  In *In re Zyprexa Prods. Liab. Litig.*, 451 F. Supp. 2d 458 (E.D.N.Y. 2006), the court makes no mention any expert witnesses or contracts entered into by a steering committee. In *In re FEMA Trailer Formaldehyde Prods. Liab.*, 401 F. App'x 877 (5th Cir. 2010), the opinion states that the steering committee retained an expert, but there is no explanation of who signed the contract with the expert nor were there any issues regarding the contract. It could have been that the steering committee signed the contract or that an individual law firm did – it was never addressed by the court.

Finally, Lommen has failed to explain how, assuming *arguendo* it is common practice for steering committees to enter into such contracts, that practice is relevant to this case. Common practice does nothing to make a void contract legal, and Lommen has produced no authority analogous to the present situation, i.e., where one of these commonly practiced contracts between a non-entity steering committee and an expert was breached. Contrary to Defendant's arguments, whether the PSC could or would partially perform a contract is irrelevant to whether it was a legally cognizable entity with the capacity to enter into a contract and be sued.

**2.  Defendants May Be Held Liable As "Promoters"**

Both Lommen and Kim argue that, if the PSC could not enter into a contract, then Plaintiffs cannot hold them liable because they were not signors. Plaintiffs disagree. The District of Columbia has embraced the principle that, where a contract is signed on behalf of a non-existent entity, those persons purporting to act on behalf of the entity with knowledge that it does not exist are jointly and severally liable. *See Ellipso, Inc. v. Mann*, 2006 WL 1126814 *1 (D.D.C. 2006) ("individuals purporting to act on behalf of a corporation with knowledge that no corporation in fact exists are jointly and severally liable for any liabilities so incurred"); D.C. Code §§ 29-302.04 and 29-402.04. Defendant Kim recognizes this principal but argues that the District of Columbia specifically declined to extend this type of liability to parties who did not sign the contract in *Shoreham Hotel Ltd. Partnership v. Wilder*, 866 F. Supp. 1 (D.D.C. 1994). This is not the case.

In *Shoreham*, the court noted that the majority rule is that "where two or more persons associate in the joint enterprise of promoting a corporation, and they or one of them makes a contract which is within the scope of the promotion, all of them are liable on or with respect to the contract as partners." *Shoreman*, 866 F. Supp. at 5 (quoting 41 A.L.R. 2d at 488). The court also noted that there was authority suggesting that the District of Columbia has adopted some form of the majority rule. *Id.* In fact, the reason that the *Shoreham* court ultimately refused to extend liability to the defendants in that case was because the plaintiffs had failed to plead that the party who actually signed the contract, who was not a party to the lawsuit, was a promoter or even an agent of the entity. Because the court could find no authority to extend liability on a contract to promoters where the contract was apparently not signed by a fellow promoter or agent, the claims against those defendants were dismissed. *Id.* at 5-6.

This is not the situation here. Plaintiffs alleged that the contracts, and specifically the 2004 Amendment, was signed by "a representative of the PSC and all Defendants herein." [Complaint at ¶ 24]  Because Plaintiffs have properly pled that the signor of the contract was an agent of the PSC and of Defendants, the decision in *Shoreham* is not applicable, and the majority rule – that all of the Defendants be jointly and severally liable for the contract signed in the name of the nonexistent entity – be applied.  Thus, Defendants' Motions to Dismiss on this basis should be denied.

Defendants' Motions to Dismiss demonstrate precisely why this case cannot be dismissed at this stage of the proceedings.  Whereas Kim appears to agree that the PSC is a non-entity and therefore Plaintiffs' contracts with the PSC are void, Lommen goes to great lengths to explain why the PSC had the capacity to contract and why the contracts are not void. [Kim Brief at pg. 10; Lommen Brief at pg. 12]  The existence or non-existence of an entity is an issue of fact. *See Jonathan Woodner Co. v. Laufer*, 531 A.2d 280(D.C. 1987).

**E. Plaintiffs Have Pled Sufficient Facts to Support Defendant's Ratification of the Contract**

Kim complains that it could not have ratified the contract between the Plaintiffs and the PSC because it did not understand the "material facts and circumstances" and, therefore, its intent to ratify was not crystal clear.  However, Kim mischaracterizes both the "material facts and circumstances" and the "crystal clear" requirement.

The law of the District of Columbia is clear that a party can impliedly ratify a contract. In *Lewis v. Washington Metro. Area Transit Authority*, 463 A.2d 666 (D.C. 1983), the court very clearly summarized the law of ratification:

> Although an agent may not be authorized to do a certain act, if the principal, with knowledge of the act, acquiesces in it, by allowing the agent to do similar acts, or by retaining the benefits of the act when it was done in service to him, then the past unauthorized act is ratified. W. Seavey, Agency §§ 21, 38, at 39, 73 (D.C.1964). The principal may ratify the act expressly or impliedly, by conduct

> inconsistent with any other hypothesis, *Greyvan Lines v. Nesmith*, 50 A.2d 434,
> 437 (D.C.Mun.App.1946); and once he has done so he is bound by the agent's act
> nunc pro tunc. *Wittlin v. Giacalone*, 84 U.S.App.D.C. 140, 171 F.2d 147, 148
> (1948); *Dorothy K. Winston & Co. v. Town Heights Development, Inc.*, 376
> F.Supp. 1214, 1216 (D.D.C.1974).

*Id*. at 671-72 (footnote omitted). While the doctrine of ratification only applies where a party's intent to ratify is clear, that intent may be inferred from the conduct of the principal, including inaction and/or a failure to repudiate. *Lewis*, 463 A.2d at 671-72*; see also Thermo Contracting Corp. v. Bank of New Jersey*, 69 N.J. 352, 361, 354 A.2d 291, 296 (1976).

Plaintiffs pled that each of the Defendants knew that the PSC had contracted with Plaintiffs and that none of them took any steps to disavow or repudiate the contract. Instead, Defendants approved at least partial payment to Plaintiffs out of shared/PSC funds, which were made up of their individual contributions. [Complaint ¶ 39] Plaintiffs also pled that Plaintiffs conferred a benefit upon the PSC and its members, including Defendants. [Complaint ¶ 47] Furthermore, Defendant Lommen clearly provides evidence that the parties and other agents of the PSC continued to engage in similar acts, noting that the PSC retained "other experts" in addition to Plaintiffs. [Lommen Brief at 13] By failing to disavow the contract, acting in furtherance of the contract, accepting the benefit of the contract, and continuing to enter into similar contracts, the Defendants ratified the PSC's contract with the Plaintiffs. Thus, Plaintiffs have sufficiently pled facts to support Defendants' ratification of the contracts at issue.

Kim argues that it could not have ratified the contract because it did not understand the "material facts and circumstances" of the agreement, *i.e.*, that the contract authorized the payment of fees in excess of those awarded by the Vaccine Court or that Kim would be accepting joint and several liability in the event of a breach. These arguments are irrelevant to the question of ratification. ***All*** of the PSC's experts were paid the full amount of their invoices

by the PSC.  [PSC's response to Interrogatory No. 11, Exhibit W] In every case, these payments were well in excess of the amount reimbursed by the Vaccine Court.  [*Id.*]  Kim fails to explain why it thought that the Geiers' fees were capped but the other experts' fees were not.  Especially where Kim insists that it did not read the Geiers' contracts, it is difficult to understand why Kim would expect the Geiers to be treated differently than the other experts.

Kim offers no contention that he did not know the Geiers had been retained by the PSC, only that he had no contact with them.  But if the Geiers were retained as experts, Kim would certainly assume that those experts were to be paid, as the other experts were.  Only a deplorable lack of curiosity would have prevented Kim from easily accessing the Geiers' contracts to determine their payment arrangements.  In any event, the doctrine of ratification does not turn on whether Kim has a "crystal clear" understanding of the payment terms—terms of which his joint venturers were certainly aware—but on Kim's acceptance of the benefits of the consulting services and failure to repudiate those services.

Kim's purported failure to review the Geiers' contracts is certainly no reason to dismiss the Geiers' complaint.  Kim is presumed to know the contents of a contract to which it assents. (*See* Restatement (Second) of Contracts § 157, cmt. b: "Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them; his assent is deemed to cover unknown as well as known terms.")  Kim and the other Defendants knew of the contract, failed to repudiate it, allowed the PSC to enter into additional contracts, and retained the benefits of those contracts; in other words, Kim and the other Defendants ratified the contract of the PSC through their conduct.

Plaintiffs have learned since filing their Petition that Kim and representatives of Lommen and Williams Kherker were on the PSC's Expert Subcommittee, which was responsible for

36

identifying and retaining expert witnesses, and were also members of the PSC's Executive Committee, which was responsible for directing the activities of the PSC and approving payments.  It is difficult to imagine that parties occupying these positions were not aware of the retention and payment of these expert witnesses.

**F.  The Geiers' Contract Requires the PSC to Pay "Non-Contingent" Fees.**

**1.  The Defendants' Construction of the Contract is Contrary to the Contract Language and the Vaccine Court Rules and Guidelines**

Defendants assert that the 2004 Amendment is unambiguous and "clearly makes the PSC's obligation to pay the Geiers conditioned upon the approval of the Vaccine Court." [Lommen's Brief, pg. 15]  However, in offering this analysis, Defendants omit important context from the agreements signed by the parties.  The 2003 Agreement identified consulting services that would be performed by the Geiers and stated the hourly rates that they would be paid by the PSC.  The 2004 Amendment deferred the payment of those fees.  Specifically, the payment language of the 2004 Amendment reads:

> ***Expert fees deferred.***  The Geiers understand and agree that they will not be paid their time on this project until the Vaccine Court has approved their fees, which may not be for two or more years.  ***They are not working on a contingency fee basis, but on a deferred fee basis.***  The PSC will support them in their fee petition and will help to get the Geiers paid fairly and fully at the appropriate time.

[Exhibit 2 to Plaintiffs' Complaint (emphasis added)]  This language does not state that the Geiers' fees are conditioned on the approval of the Vaccine Court.  It simply says that the payment of the fees will be deferred until the Vaccine Court has approved their fees.  In other words, the modification of the 2003 Agreement concerned only the timing of the PSC's payment obligations—not the abrogation of those obligations.  There is no language in this paragraph that excuses the PSC from the payment obligations that were clearly identified in the 2003 Agreement.  Indeed, the second sentence in this passage states that the Geiers "are not working

on a contingency fee basis, but on a deferred fee basis."  The Defendants' interpretation makes the payment of the Geiers' fees ***contingent*** on the approval and payment of fees by the Vaccine Court.  This is directly contrary to the contract language, which clarifies that the purpose of the amendment is ***not*** to make the payment of the Geiers' fees contingent, but to merely defer the PSC's payment obligation first contemplated in the 2003 Agreement.  Lommen argues that if the Geiers' construction were correct, the 2004 Amendment would have said something to the effect of "the Geiers will get paid all of their fees, regardless of the Vaccine Court's approval."  But the 2003 Agreement states that the PSC will pay Dr. Geier's fees, and the 2004 Amendment defers that obligation until the fee application is approved and makes clear that the payment obligation is not contingent.  Therefore, all of the elements contained in Lommen's suggested passage are already present in the existing contract language.  If Lommen's construction was the correct one, the 2004 Amendment would contain clear language abrogating the PSC's clear obligation to pay the Geiers, as established by the 2003 Agreement.   But nowhere in the 2004 Agreement is the PSC's payment obligation terminated.  To the contrary, there is a discussion of the submission of invoices and the current payment of costs by the PSC.

The purpose of the 2004 Amendment was not to terminate the PSC's payment obligation but to give the PSC and its constituent firms sufficient time to recover the Geiers' fees, the other experts' fees, and perhaps most importantly, the law firms' fees.  From this likely substantial recovery there was probably going to be sufficient funds to cover the Geiers' hourly fees.  Indeed, that is exactly what happened.  Williams Love alone recovered over $3,000,000 in fees from the Vaccine Court for its work on the vaccine test cases.  Clearly, this amount was more than sufficient to cover the Geiers' fees.

Lommen asks, "if payment was not conditioned on the Vaccine Court's approval, then why did the 2004 Amendment explicitly state that, '[t]he PSC will support them in their fee petition and will help to get the Geiers paid fairly and fully at the appropriate time?'" [Lommen's Brief at 16]  Lommen's argument suggests that the Geiers can bring their own fee petition in the Vaccine Court.  However, this is contrary to the Vaccine Court rules.  Vaccine Guideline XIV [Exhibit R] provides that the "Program provides *reimbursement* of reasonable attorneys' fees and other litigation costs…."   (Emphasis added.) This language suggests that the Program does not pay expert witnesses directly but reimburses attorneys or their clients for litigation costs, and this interpretation is supported elsewhere in Guideline XIV.  The Guideline also provides that a fee petition must include a "statement, signed by petitioner, specifying any costs which were borne by petitioners personally rather than counsel…."  (*See also*, General Order #9 ("[T]he court shall require in all future applications for fees and costs a statement signed by petitioners and counsel which clearly delineates which costs were borne by counsel and which costs were borne by petitioners, including the amount of any retainer that has been paid.")  The obvious purpose for requiring this statement is to indicate to the Court who is seeking reimbursement.  There is no provision for an unpaid expert witness or consultant to directly seek relief from the Vaccine Court.  Indeed, Rule 15 of the Vaccine Court Rules [Exhibit S] provides that "[n]o person may intervene in a vaccine injury compensation proceeding…." Therefore, the contractual reference to "their [the Geiers'] fee petition" is a misnomer.  The Geiers were not legally able to file a fee or cost application.  The Vaccine Court rules provide that only the PSC, its member firms, and the Petitioners may seek *reimbursement* of fees.  These rules assist in understanding what the parties intended in entering into the 2003 Agreement and the 2004 Amendment.  The Geiers were to be paid by the PSC, and the PSC was to seek

39

*reimbursement* of the Geiers' fees.  Indeed, the interim fee application that was prepared by the PSC [Exhibit T (voluminous exhibits omitted)] reflects that it is the PSC seeking fees, and by all appearances, the PSC was the stakeholder that would benefit from any award of costs and fees by the Court.  When a check was issued by the Vaccine Court relating to the Geiers' fees [Exhibit U], it was sent to Williams Love and designated the PSC and the Petitioners as payees.

The Defendants' construction of the contract holds that the Geiers were to bring their own fee application and were the stakeholders on any award by the Vaccine Court leads to an illegal result.  "[A]mbiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable."    *Nat'l Labor Relations Bd. v. Local 32B-32J Serv. Employees Int'l Union, AFL-CIO*, 353 F.3d 197, 202 (2d Cir. 2003) *Walsh v. Schlecht*, 429 U.S. 401, 408, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977) ("Since a general rule of construction presumes the legality and enforceability of contracts, 6A A. Corbin, Contracts §§ 1499, 1533 (1962), ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable."); *Venizelos S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir.1970) ("[I]f an agreement is fairly capable of a construction that will make it valid and enforceable, that construction will be given it."); s*ee also*, *Cent. States, Se. & Sw. Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1258 (7th Cir. 1994) ("Terms that are lawful as written may not be given an illegal spin as part of an effort to curtail the obligation they create."); Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.")

Finally, the balance of the contractual language cited by Lommen supports the Geiers' construction. The statement providing that the Geiers are to be paid "fairly and fully at the appropriate time," is inconsistent with the notion that the payment of the Geiers fees was contingent on a favorable ruling by the Vaccine Court.

Under 42 USC §300aa-15(e)(1)(B), compensation of fees and costs to a petitioner not awarded compensation is contingent on the "special master finding that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Indeed, the relevant Petitioners here, the King Family, did not prevail on their Petition and did not recover compensation from the Vaccine Court. The Geiers have no control over the good faith of the PSC attorneys and no legal training that would allow them to evaluate whether there was a reasonable basis for the claims brought by the Petitioners. Yet according to the Defendants' construction of the contract, the payment of the Geiers' fees was also necessarily contingent on the Vaccine Court finding that the Petitioners' attorneys possessed such good faith. This is not only an absurd result, it is completely inconsistent with the notion that the Geiers were to be paid "***fairly and fully*** at the appropriate time."

Lommen also argues that language in the 2004 Amendment explicitly requiring the PSC to pay out-of-pocket expenses "on a rolling basis" supports the Defendants' construction of this contract when compared to the absence of such explicit language relating to the Geiers' fees. However, the PSC's obligation to pay the Geiers' hourly rates had already been established by earlier contracts, and as previously discussed, there is no explicit abrogation of this obligation in the 2004 Amendment. The PSC's obligation to pay costs currently was consistent with its obligation to pay fees, albeit on a deferred basis. The Geiers' explicit obligation to submit

monthly statements of their *time* and expenses to Michael Williams, the chair of the PSC, was also consistent with the PSC's obligation to pay the Geiers' fees.

Lommen also argues that the 2004 Amendment does not incorporate the hourly rates set forth in the 2003 Agreement. It also argues that David Geier was not a party to the 2003 Agreement, and that his hourly rates were never established. However, Mark Geier's rates were established in the 2003 Agreement. It would have been redundant to restate them where the only purpose of the 2004 Amendment was to defer receipt of payment on the invoices. Moreover, David Geier's rates had also been previously established at $250 per hour (s*ee, e.g.,* invoice dated October 3, 2003, Exhibit V).[8] By signing the 2004 Amendment, David Geier was also agreeing to defer receipt of payment on his invoices.

Finally, Lommen relies on the Vaccine Court's order noting the lack of evidence to support David Geier's rates. [Lommen Brief at 17] However, this argument buttresses the Plaintiffs' arguments that the Defendants did not adequately support the Geiers in the PSC's fee application by submitting such support as it was the PSC who prepared all the legal briefing and arguments.

Any fair reading of the 2003 Agreement and the 2004 Amendment must be construed to mean that the PSC's payment to the Geiers was not contingent on the approval of the Vaccine Court. Contrary to Defendants' unreasonable assertions, a reasonable person would not read this language to suggest that the Plaintiffs were willing to work for numerous years with payment entirely contingent on the Vaccine Court's approval of the attorneys' good faith in bringing the claims *and* the usefulness and relevance of the Geiers' work in the prosecution of those claims. Indeed, the 2004 Amendment specifically states that payment is ***not contingent but only***

---

[8] The invoice bears the name "Medcon, Inc.", a company owned by David Geier through which he was billing his time in 2003.

*deferred*.  Rather, the 2004 Amendment when read with the 2003 Agreement, leaves no doubt that the PSC agreed to pay the Plaintiffs, just at a deferred time.

Finally, if the Court finds that the 2004 Amendment is ambiguous, the ambiguity must be construed against the drafter, in this case, the Williams Love law firm acting on behalf of the PSC.  [*See* Exhibit A, ¶ 5, 10]  *See*, *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982) (ambiguities in contract construed most strongly against drafter) (*citing*, *Cowal v. Hopkins*, 229 A.2d 452 (D.C.App. 1967); *McIntosh v. Group Health Association, Inc*., 138 A.2d 496 (D.C.Mun.App 1958).

**2.  The Plaintiffs' Fees are Not Limited by the Vaccine Act**

Citing *Beck by Beck v. Sec'y of HHS*, 924 F.2d 1029, 1033 (Fed. Cir. 1991), Defendants assert that expert witness fees are necessarily capped to the amount authorized by the Vaccine Act.  [Lommen Brief at 17-18]  Defendants entirely misconstrue the *Beck by Beck* decision and the Vaccine Act.  *Beck by Beck* merely addresses what an *attorney* may charge a petitioner who pursues a claim in the Vaccine Court.  This case does not in any way address what an expert witness may charge an attorney.   Defendants cite no authority – nor is there any– prohibiting an attorney from contracting with an expert to pay the expert his fees and costs in performing work for the attorney's case.  Indeed, Defendants cannot deny that they entered into such a contract in 2003 with the Plaintiffs and paid them directly on a monthly basis for their work under the 2003 contracts.  Moreover, Defendants paid all of the other experts' fees in this case, and in some cases, received no compensation from the Vaccine Court for these costs.  In its responses to the Plaintiffs' interrogatories, the PSC admitted to that it paid all of its expert witnesses other than the Geiers "the amounts billed or invoiced by those experts as they came due, because none of those experts had agreed to limit their fees to the amounts actually awarded by the Vaccine

Court, or to defer payment of their fees until such an award was made." [Interrogatory No. 11, Exhibit W] There is simply nothing in the Vaccine Act, the Vaccine Court Rules, or the Vaccine Court Guidelines that cap an expert witness's fees to the amount approved for reimbursement by the Vaccine Court. As demonstrated above, the risk of not being reimbursed rests with the attorney or the petitioner that paid that expert.

## G. The Geiers Have Properly Pled a Claim for Unjust Enrichment

Defendants' assertion that Plaintiffs' claim for unjust enrichment should fail because the Plaintiffs may not plead both a breach of contract and an unjust enrichment is without merit. [Lommen Brief at 19] District of Columbia law is clear that a party may plead both a breach of contract claim and an unjust enrichment claim in certain circumstances. In *Harrington v. Trotman*, 983 A.2d 342 (D.C. 2009), the Court summarized the various circumstances under which the existence of a contract does not necessarily subsume a claim for unjust enrichment.

> Unless there is a basis to set aside a contract as unenforceable (i.e., "because of [the claimant's] own breach... as a result of impracticability of performance or frustration of purpose... or in consequence of the other party's avoidance for some reason as misrepresentation, duress, mistake or incapacity," Restatement (Second) of Contracts § 344 cmt. d (1981)), a court is not at liberty to grant equitable relief…. *See Lee v. Foote*, 481 A.2d 484, 485 (D.C.1984) (per curiam) ("When an express contract has been repudiated or materially breached by the defendant, restitution for the value of the non-breaching party's performance is available as an alternative to an action for damages on the contract."); *Ingber v. Ross*, 479 A.2d 1256, 1263 (D.C.1984) (allowing restitution when ordinary relief for breach of contract is not adequate, and remedies are not cumulative to provide double recovery); . . . .

Plaintiffs pled an unjust enrichment claim as an alternative to breach of contract because it anticipated that one or more Defendants might argue that the PSC was not a legally cognizable association. Indeed, that has happened in this case. Defendant Kim asserts that the PSC is a "non-existent" entity, and the contract with the Geiers is void. [Kim Brief at 10] If this proves to be the holding of this Court, it may also be the finding of this Court that the Defendants were

not in a contractual relationship with the Plaintiffs.[9]  Indeed, as explained above, the PSC has asserted in discovery that it was never a formal legal entity.  [Interrogatory No. 1, Exhibit W][10] Therefore, Plaintiffs' unjust enrichment claim should survive the Defendants' Motions to Dismiss because there is a fact issue as to whether Defendants entered into the contracts knowing that they would not be performed by a legally cognizable entity.  Moreover, Plaintiffs' unjust enrichment claim stands because District of Columbia law allows an unjust enrichment claim where there is evidence of bad faith, fraud, and breach of contract by the Defendants. Defendants all clearly benefitted from the Plaintiffs' expert consultation and work on the study they were hired to complete.  The Plaintiffs provided Defendants with knowledge and assistance in preparing their case on behalf of their clients which led to payment of attorneys' fees by the Court.  Indeed, Powers, on behalf of the PSC and its members, admitted that the Geiers' work was "valuable to developing our understanding of the issues in the case, and in developing factual information we needed to prepare these cases for hearing." [*See* Exhibit H]  Further, the Defendants benefitted because its member firms were paid their fees by the Court.  Plaintiffs' unjust enrichment claim is properly pled and should not be dismissed by this Court. Furthermore, as established above, there are clear fact issues supported by evidence submitted to this Court as to whether the Defendants entered into the contracts with the Geiers knowing that it

---

[9] As previously discussed, the Plaintiffs contend the PSC was a joint venture.  Certainly, any adjudication of this fact-driven issue would be premature.  Therefore, it is appropriate to leave the Plaintiffs' alternative claim of "unjust enrichment" pending while these issues are litigated.

[10] Defendant Kim argues that if the PSC contract is void, Michael Williams would be liable under the contract.  But any contractual relationship between Williams and the Geiers would not preclude an unjust enrichment claim against the Defendants.  *See, e.g.*, *Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co*., 870 A.2d 58 (D.C. 2005) (*citing*, *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 155-56 (1966); *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co*., 695 So.2d 383, 387-88 (Fla.Dist.Ct.App.1997) (both holding that a plaintiff may recover in quasi contract for unjust enrichment against one not a party to the contract under which the plaintiff provided services.

was not a legally cognizable organization and whether the Defendants directly benefitted from the Geiers' work.  Accordingly, the Defendants' Motions should be denied.

**H. Plaintiffs Have Stated a Claim for Joint and Several Liability for Professional Negligence**

Defendant Kim points out that, in order to be considered a joint tortfeasor and therefore jointly and severally liable for damages, a party must have either been concurrently negligent or be a member of a "joint venture that caused tortious injury." [Kim Brief at 15 (quoting *Faison v. Nationwide Mortg. Corp*., 839 F.2d 680, 685 (D.C. Cir. 1987)]  As Plaintiffs have sufficiently pled facts supporting both an attorney-client relationship [*See* Section I herein] and the existence of a joint venture, either in fact or by estoppel [*See* Section A-2 herein], Defendant's Motion to Dismiss Count Six must be denied.

**I.  Plaintiffs Have Stated A Valid Claim For Professional Negligence.**

Plaintiffs' Complaint leaves no doubt that the Plaintiffs have not only *pled* specific facts to support that an attorney-client relationship was formed between Plaintiffs and the PSC and Williams Love, but that Plaintiffs have *presented evidence* to this Court that such a relationship existed.  Furthermore, Plaintiffs have submitted declarations with this response brief to support the existence of an attorney-client relationship.  [*See* Exhibits A and B]  Specifically, based on these facts and evidence, it cannot be disputed that the Defendants filed briefs with the Vaccine Court for the sole purpose of collecting fees for the Plaintiffs and counseled the Plaintiffs regarding the timing of such filings and the legal arguments to include therein.  [Exhibit A, ¶¶ 10-13; Exhibit B, ¶¶ 6-9] Indeed, Williams and Powers admit in discovery that the Plaintiffs were the *only* individuals with a stake in the PSC fee application insofar as it was based on the Geiers' invoices.  [Williams and Powers' Response to Plaintiffs' Interrogatories, No. 15, Exhibit J]  Further, Defendants negotiated on the Geiers' behalf with the Department of Justice in

settling the Plaintiffs' fee request. [7/16/09 Letter from Powers to Geiers, Exhibit X; Exhibit A, ¶¶ 10-13; Exhibit B, ¶¶ 6-9]  Furthermore, and perhaps most importantly, the Defendants believed that they were acting as the Plaintiffs' attorneys in seeking an award of fees, and the Plaintiffs accepted the Defendants' legal services by appointing them to file briefs and negotiate on their behalf.  When the Defendants sought to end the attorney-client relationship, Powers wrote to the Plaintiffs and explained:

> "…it appears that we no longer have a relationship based on trust or respect and *we therefore are not the best lawyers to pursue your claimed fees and costs* beyond the supplemental filing we plan to submit very soon…You may want to avail yourselves of that option going forward-*either submitting additional material pro se, or retaining another attorney to submit them for you*…

[*See* Exhibit H]  Powers' written statements to Plaintiffs seeking to end the attorney-client relationship is undoubtedly enough evidence to withstand Defendants' Motions to Dismiss asserting that no attorney-client relationship exists.  Given Defendants' own statements and admissions it is astonishing that Defendants deny to this Court that such a relationship existed.

The facts pled by Plaintiff establish under District of Columbia law that Defendants clearly acted as Plaintiffs' counsel in trying to obtain the Plaintiffs' fees from the Vaccine Court. "The existence of an attorney-client relationship is an issue to be resolved by the trier of fact and is predicated on the circumstances of each case."  *In re Lieber*, 442 A.2d 153, 156 (D.C.1982). "An attorney's ethical duties to a client arise not from any contract but from the establishment of a fiduciary relationship between attorney and client. Such a relationship is often established before a contract even exists:

> The fiduciary relationship between an attorney and his client extends even to preliminary consultations between the client and the attorney regarding the attorney's possible retention.... All that is required ... is that the parties, explicitly or by their conduct, manifest an intention to create the attorney/client relationship.

*In re Ryan*, 670 A.2d 375, 379 (D.C. 1996) (*citing*, *Nolan v. Foreman*, 665 F.2d 738, 739 n. 3 (5th Cir.1982) (citations omitted). "It is well established that neither a written agreement nor the payment of fees is necessary to create an attorney-client relationship .... Furthermore, it is not necessary for an attorney to take substantive action and give legal advice in order to establish such a relationship." *Id*. at 379-80. (*Citing*, *In re Lieber*, 442 A.2d 153, 156 (D.C.1982) (citations omitted).

The Restatement (Third) of the Law Governing Lawyers outlines the typical and usual requirements of an attorney-client relationship. It provides:

> A relationship of client and lawyer arises when:
>
> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
>
> (a) the lawyer manifests to the person consent to do so; or
>
> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or
>
> (2) a tribunal with power to do so appoints the lawyer to provide the services.

Plaintiffs have pled facts and presented evidence to support one or more of these elements.

*First,* Plaintiffs have established that Defendants expressed their understanding and agreement that they were acting as counsel for the Plaintiffs with regard to helping them collect their fees. Importantly, under Defendants' interpretation of the 2004 Amendment, Plaintiffs were to file their own fee petition with the Vaccine Court, and the PSC (referred to as (*sic*) "LawFirm" under the 2003 Agreement) was to offer "support" and "help." Thus, the 2004 Amendment became the retainer agreement, although such a written agreement is not required under District of Columbia law. *See In re Bernstein,* 707 A.2d 371, 375 (D.C. 1998) ("It is well established that neither a written agreement nor the payment of fees is necessary to create an

attorney-client relationship." (*Citing*, *In re Lieber*, 442 A.2d 153, 156 (D.C.1982)).  "Whether an attorney-client relationship existed is to be determined by the fact finder based on the circumstances of each case."  *Id*.  The PSC assigned Williams and Powers to act as the legal counsel for Plaintiffs to "help" them get paid.

*Second*, Plaintiffs established that they appointed Defendants to act as their attorneys. Defendants prepared briefs for the Geiers and negotiated with the Department of Justice to settle the Geiers' claims.  Williams and Powers provided legal advice to the Geiers in determining which services to include in the fee application.  [Exhibit A, ¶¶ 13; Exhibit B, ¶¶ 8] In filing these briefs and engaging in these negotiations, the Defendants made legal arguments on behalf of the Geiers to the Vaccine Court with regard to the reasonableness and necessity of the fees. Lommen argues that there is no allegation that the Geiers believed that Williams and Powers were their attorneys for the purpose of recovering their fees from the Vaccine Court.  To the contrary, paragraph 52 of the Complaint makes it clear that while maintaining their position that the PSC was primarily liable for their fees, they agreed to "temporarily acquiesce" in Williams' and Powers' attempts to recover the fees from the Vaccine Court.  Other communications from Williams and Powers, discussed herein, clearly indicated that the Geiers' interest in recovering their fees from the Vaccine Court were being advocated by Williams Love.

Lommen also asserts that the Plaintiffs truncated the text of a sentence where Williams and Powers informed them that they had "undertaken a vigorous defense of your work, as well as the work of all the other experts, along with the work of all the lawyers involved."  However, it is clear that Williams Love was not representing those other expert witnesses because their fees had all been paid by the PSC, and they therefore had no stake in the outcome of the fee petition. [Interrogatory No. 9**,** Exhibit J]  Thus, all of the parties who had a stake in the outcome of the fee

and cost application were law firms that were perfectly capable of representing themselves. The Geiers make no claim and indeed have no knowledge concerning whether Williams Love did or did not represent these other law firms with respect to obtaining the fees and costs these parties were seeking. However, resolution of this issue is immaterial to whether Defendants acted as counsel for the Geiers in the procurement of their fees.

Williams and Powers admitted that the only persons with an interest in the outcome of the Geiers' fee application *were the Geiers.* [Interrogatory No. 15, Exhibit J] Therefore, in advocating for the recovery of their fees, it is clear that Williams and Powers were not advocating for themselves or for the underlying petitioners; it was the Geiers who were the stakeholders. Williams and Powers, on behalf of the PSC, filed briefs, including supplemental briefs and appeals, and acted as the Geiers' lawyers in seeking the procurement of these fees. The legal services provided by the PSC for the Geiers are the very essence of an attorney-client relationship, and this relationship has been properly pled by the Plaintiffs.

The Defendants' own written statements establish that they knew they were acting as the Geiers' attorneys and belie their current denials that such a relationship existed. Communications from Williams and Powers establish the understanding of everyone involved that Williams and Powers were advocating the Geiers' claims for compensation to the Vaccine Court. For example, Plaintiffs' Exhibit "Y", Email from Tom Powers to Plaintiffs:

> …it appears that we no longer have a relationship based on trust or respect and we therefore ***are not the best lawyers to pursue your claims fees and costs*** beyond the supplemental filing we plan to submit very soon…You may want to avail yourselves of that option going forward—***either submitting additional materials pro se, or retaining another attorney to submit them for you***…To date we have submitted your billings along with the larger PSC petition; we have supported the claimed fees and costs in a response brief; and we will supplement those pleadings with the supplemental filing…***Beyond that, we plan no further work on your behalf.***

And Plaintiffs' Exhibit "X", Letter from Williams and Powers to the Geiers:[11]

> You [the Geiers] suggested in recent emails and phone calls **_that you both are concerned that the PSC has adequately advocated for your interests_** in obtaining an award of your fees from the special master.  As I explained, **_we've undertaken a vigorous defense of your [the Geiers'] work..._**

Williams and Powers then go on to explain in depth the legal positions taken on behalf of the Geiers and provide their legal opinion:

> **_In our legal judgment_**, this position finds better support in the facts of the proceeding then your apparent belief that the court approved and authorized you work.  **_There is no doubt that the position we've taken is a difficult one under the case law, but it is legally and factually defensible...we continue to defend your entitlement to the fees submitted on your behalf_** in the interim fee petition.  **_We will supplement our defense of your fees...and will keep you advised of progress on the resolution of your fee claim._**

Accordingly, the undisputed statements by Defendants in this case establish the existence of an attorney-client relationship, a relationship that Powers at one time tried to sever by advising the Plaintiffs to retain another attorney or to proceed *pro se*.  Defendants' assertion that no attorney-client relationship existed is contrary to the facts pled by Plaintiff and belied by the evidence presented to this Court.  Plaintiffs have set forth sufficient facts to support an attorney-client relationship in their Complaint against the Defendants.   This Court should deny Defendants' Motions to Dismiss.

## J.  The Geiers Have Sufficiently Pled Civil Conspiracy

The Defendants contend that the Civil Conspiracy claim is not adequately pled.  However, "Rule 8(a)(2) only requires 'a short and plain statement of the claim showing that the pleader is entitled to relief . . . .' A complaint meeting that bare minimum requirement may not

---

[11] The Defendants assert that because Williams and Powers referred to the autism petitioners as "clients," and this must mean that no attorney relationship was formed with the Geiers.  The Geiers were well aware that Williams and Powers had other clients in the Vaccine Court litigation.   They were simply unsophisticated about attorney professional ethics prohibitions against conflicts of interest or the fact that their financial interests were being decimated in favor of those other clients.  It was the persistent conflicts of interest with those other clients that contributed to the derailment of the Geiers' recovery of fees from the Vaccine Court.

be dismissed as long as no heightened pleading standard is required (as in fraud cases, *see* Rule 9(b))." *Burnett v. Al Baraka Inv. and Development Corp.*, 274 F. Supp. 2d 86, 103 (D.D.C. 2003). In essence, a defendant must simply be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). This simplified standard "applies to all civil actions, with limited exceptions." *Id.* at 513.

In *Burnett*, the D.C. District Court held that "[t]here is no heightened pleading requirement for civil conspiracy, nor is civil conspiracy exempt from the operation of Rule 8(a)." 274 F. Supp. 2d at 110 (citing *Swierkieicz*, 534 U.S. 506 and *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000). In fact, the *Burnett* court noted that, because of the "nature of conspiracies," a plaintiff "should be allowed to resort to the discovery process and not be subjected to a dismissal of his complaint" so long as it contains enough information to give notice to the defendant and to allow the court to assess the validity of the claim for relief. *Id.* at 110-111. Plaintiffs have pled sufficient facts to satisfy this burden.

The elements of a civil conspiracy are as follows: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Id.* at 105. Moreover, a "joint venturer's liability extends to all reasonably foreseeable acts done in connection with the tortious act that the person assisted." *Id.* (*citing, Halberstam v. Welch,* 705 F.2d 472, 477, 484 (D.C.Cir.1983)).

The evidence adduced by Plaintiff so far is that three of the four Defendants (Lommen, Kim, and Williams Kherkher) had attorneys who sat on the "Experts Committee" of the PSC

during the time that the Geiers signed contracts with the PSC. (To date, the Plaintiffs have not been able to confirm whether Conway was on this Committee, though Conway was on the PSC's Executive Committee.) They must have known that the PSC was designated as the sole party to the Geiers' contract. They must have known, as they contend today, that the PSC was not a legally cognizable entity-- a legal nullity-- against which the Geiers would have no legal recourse after providing years of consulting services. They must have known that the Geiers would have no recourse against the Vaccine Court in recovering their fees, since the Geiers were not eligible to recover their fees in this manner. And as members of the PSC Expert Committee, they must have voted or otherwise approved the written contract extended to the Geiers, thereby aiding and abetting the conspiracy. By agreeing to act as the Geiers' attorneys on their fee application (if that was really their understanding of the 2004 Amendment in 2004), these law firms knew that the Geiers would have no legal recourse against the Vaccine Court and would ultimately be left without compensation for their considerable services. Nevertheless, as fiduciaries to the Geiers, these attorneys had a duty of full disclosure. Clearly, this duty was breached. As recognized by the *Burnett* Court, the nature of conspiracies is such that an aggrieved party is not informed of the details of what happened, who was involved, what was agreed to, etc. Nevertheless, there is abundant information available suggesting that these sophisticated law firms conspired to take advantage of their far less legal savvy expert witnesses.

The decision cited by Defendants, *Acosta Orellana v. CropLife Int'l*, 711 F.Supp.2d 81 (D.D.C. 2010), is inapposite. That decision merely found that the plaintiff failed to meet notice pleading requirements. In the case *sub judice*, far more information has been provided to support the civil conspiracy committed by the Defendants. However, to the extent this Court disagrees, Plaintiffs will amend their pleadings to provide the necessary details.

Defendant Kim cites *Carroll v. Fremont Inv. & Loan*, 636 F.Supp.2d 41 (D.D.C. 2009) for the proposition that one cannot conspire with its own agents.  This case actually stands for the proposition that "[a] corporation cannot… conspire with its employees or agents, because 'a corporation and its agents constitute a single legal entity that cannot conspire with itself.'"  *Id*. at 53 (c*iting*, *Tabb v. District of Columbia*, 477 F.Supp.2d 185, 190 (D.D.C. 2007).  Likewise, the other case cited by *Kim Healy v. CTP, Inc*., 1994 WL 846898 (N.D. Ill. 1994), states only that "as a matter of law, a corporation is incapable of conspiracy with its agent."  A corporation can only act through its agents, so these propositions of law make sense.  It is a completely different proposition of law to say that two people cannot conspire because they are principal and agent. Were that the case, the concept of civil conspiracy would cease to exist because co-conspirators are agents for each other as a matter of law.  "The co-conspirator theory is bottomed on agency theory.  It is said that each co-conspirator acts as the agent for the others and any co-conspirator's act in a district is attributable to the other co-conspirators."  *American Trade Partners, L.P. v. A-1 Intern. Importing*, 755 F.Supp. 1292, 1304, n.19 (E.D. Pa.1990) (*citing*, *Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss & Brecher*, 635 F.Supp. 15, 18 (E.D.Pa.1985)).

## K.  Plaintiffs Have Sufficiently Pled a Claim Based on Breach of Implied Contract

Defendant Kim cites *Union Light & Power Co. v. D.C. Dep't of Empl. Servs*., 796 A.2d 665 (D.C. 2002), for the proposition that there must be an expectation of payment from the defendant.  Kim argues that, "[a]t best, Plaintiffs had an expectation of payment from the PSC," not from Kim.  *Union Light* does not state that in order to maintain a claim based on breach of an implied contract, the "expectation of payment" must be specifically pled.

In *Vereen v. Clayborne*, 623 A.2d 1190 (D.C. 1993), the Court set for the elements of a claim based on breach of an implied contract:

> (1) valuable services being rendered; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, used and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to charged that the [person rendering the services] expected to be paid by him or her.

The *Vereen* Court considered whether a borrowed servant had an expectation of payment from the borrowing employer and concluded that the employee had agreed to write a letter as a favor, not with the expectation of payment. In contrast, the Geiers knew they were providing medical consulting services for the benefit of a consortium of law firms and the clients of those law firms. They knew that the PSC, with little or no assets of its own, was being funded by the constituent law firms of the PSC. There can be no serious argument that the Geiers expected payment from each of the constituent law firms that formed the PSC. The 2003 Agreement set forth hourly rates for Dr. Geier's services. The Geiers agreed to defer receipt of those payments by signing the 2004 Amendment, but there is no indication in either agreement that the Geiers intended to offer their services as a favor. The circumstances described in detail in the Plaintiffs' Complaint are more than sufficient to demonstrate an expectation of payment from all Defendants herein.

## III. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that Defendants' Motions to Dismiss be denied.

s/James R. Klimaski
James R. Klimaski (Bar No. 243543)
Klimaski and Associates, PC
1625 Massachusetts Avenue NW, Suite 500
Washington, D.C. 20036-2245
(202) 296-5600
(202) 296-5601 (fax)
Klimaski@Klimaskilaw.com
Local Counsel for Plaintiffs

s/James M. Love
James M. Love (*pro hace vice*)
Titus Hillis Reynolds Love
  Dickman & McCalmon, PC
3700 First Place Tower, 15 East 5th Street
Tulsa, OK 74103
(918) 587-6800
(918) 587-6822 (fax)
jlove@titushillis.com
Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of August, 2012, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Dennis J. Quinn (Bar No. 455793)
*Counsel for Defendant Lommen, Abdo, Cole King & Stagberg, P.A.*

Pamela A. Bresnahan (Bar No. 366735)
Nicholas B. Reuhs (Bar No. 500005)
*Counsel for Defendant John H. Kim and Associates*

Robert W. Hesselbacher, Jr. (Bar No. 414412)
 *Counsel for Defendant Williams, Kherker Hart and Boundas LLP*

Keith Bonner (Bar No. 305938)
 *Counsel for Defendant Conway, Homer & Chin-Caplan P.C.*

s/James M. Love