**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
                                )
**MARK R. GEIER,** *et al.,*    )
                                )
         **Plaintiffs,**         )
                                )
         **v.**                  )        **Civil Action No. 12-1171 (RMC)**
                                )
**CONWAY, HOMER & CHIN-**       )
**CAPLAN, P.C.,** *et al.,*      )
                                )
         **Defendants.**         )
_____ )


**OPINION**

Dr. Mark Geier and his son, David, brought suit seeking payment for consulting services rendered.  Defendants are four law firms:  Conway, Homer & Chin-Caplan; John H. Kim & Associates, P.C.; Lommen, Abdo, Cole, King & Stageberg, P.A.; and Williams, Kherkher, Hart & Boundas LLP (collectively, the Law Firms).  The Geiers allege that a committee of attorneys, including the Law Firms, retained the Geiers to provide consulting services in support of petitions filed in the U.S. Court of Federal Claims under the National Childhood Vaccine Injury Compensation Act.  The petitions filed under the Act alleged that petitioners suffered autism as a result of certain mandatory childhood vaccinations and sought compensation from a government fund.  The Geiers contend that the Law Firms failed to pay for consulting services rendered by the Geiers.  The Law Firms move to dismiss for lack of personal jurisdiction and for failure to state a claim.  While the question of general personal jurisdiction might require discovery, it is not necessary to burden the parties or the Court because the

1

Complaint must be dismissed for failure to state a claim.  Certain Counts will be dismissed with prejudice, and others will be dismissed without prejudice.

## I.  FACTS

### A.  Petitions for Vaccine Injury

The National Childhood Vaccine Injury Compensation Act, 42 U.S.C. §§ 300aa-1–34, established the National Vaccine Injury Compensation Program.  The Program permits those who have suffered injury or death allegedly as a result of a compulsory childhood vaccine to petition the federal government for damages.  Instead of filing suit against the vaccine manufacturer or administrator, an individual claiming injury can file a petition for "no-fault" compensation against the Secretary of Health and Human Services.  *See* 42 U.S.C. § 300aa-11. Such a suit must be filed in the U.S. Court of Federal Claims, located in Washington, D.C.  The clerk of court then forwards the case to the Office of Special Masters for assignment to a special master.  *Id*. § 300aa-11(a)(1).  A tribunal that hears cases under the Vaccine Injury Compensation Act is commonly referred to as a "Vaccine Court."  In Vaccine Court, a claimant is not required to prove negligent design, negligent manufacture, or failure to warn, but he is required to causation—that a covered vaccine caused injury or death.  *Id*. §§ 300aa-11(c), -13(a), -22, -23.

Awards from Vaccine Court are payable from the Vaccine Injury Compensation Trust, funded by a federal tax on vaccines.  A petitioner has a right to receive reasonable attorneys' fees and costs, even if the Vaccine Court declines to award compensation, so long as the claim was filed in good faith.  "[T]he special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was

brought in good faith and there was a reasonable basis for the claim for which the petition was brought." *See id.* § 300aa-15(e)(1)(B).

### B.  Petitions Alleging Autism Caused by Vaccines

More than 5,000 petitions were filed in the Court of Federal Claims alleging that claimants suffered autism as a result of mandatory childhood vaccination.  *King v. Sec'y of HHS*, No. 03-584V, 2010 WL 892296, at *5 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).  Because such a large group of cases involved a common factual issue, *i.e.* whether certain vaccines caused autism, the Office of Special Masters conducted a series of informal meetings to decide how to proceed.  *Id.* at *6.  As a result, the Chief Special Master entered "Autism General Order #1," which created Omnibus Autism Proceedings.  *See Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder v. Sec'y of HHS*, 2002 WL 31696785 (Fed. Cl. Spec. Mstr. July 3, 2002) (Autism Master File, General Order #1).  In the Omnibus Autism Proceedings, the court established a Petitioners' Steering Committee (PSC).  *Id.* at *3.  Membership in the PSC was to be determined by agreement among counsel, but in the event of a dispute, membership would be resolved by the special master.  *Id.*

The PSC obtained and presented evidence regarding the general issue of whether certain vaccines cause autism and under what circumstances.  *Id.*  Then the evidence was applied to six test cases, alleging two general causation theories: (1) that the MMR vaccine[1] and thimerosal-containing vaccines can combine to contribute substantially to the causation of autism; and (2) that thimerosal-containing vaccines alone can contribute substantially to the causation of autism.  *King v. Sec'y of HHS*, No. 03-584V, 2011 WL 5926126, *1-2 (Fed. Cl.

---

[1] The MMR vaccine is an immunization shot against measles, mumps, and rubella.

Spec. Mstr. Sept. 22, 2011).  The special masters uniformly rejected both causation theories, and the petitioners were denied compensation.  *Id*.

### C.  Retention of the Geiers

On September 18, 2003, Dr. Geier and the PSC entered into a contract for consulting services.  Notice of Removal [Dkt. 1], Compl. [Dkt. 1-1], Ex. 1 (Consulting Agreement).  The Consulting Agreement provided:

> Whereas, Law Firm desires to retain Geier for consulting and/or other related services (such as for providing expert testimony), and Geier is willing to be retained on the terms and conditions below,
>
> Now therefore, Geier and Law Firm agree as follows:
>
> 1. Recitals
>
> The above recitals are made a substantial part hereof.
>
> 2. Services to be performed by Geier.
>
> Obtaining and evaluating VSD [Vaccine Safety Datalink records], screening data, obtaining medical scientific literature as defined by client need.

Consulting Agreement at 1.  While expert testimony was contemplated as a possibility, the PSC never called upon Dr. Geier to testify in Vaccine Court.  Dr. Geier executed the Consulting Agreement, and Kathleen M. Dailey signed it as "Member NVICP[2] PSC Executive Committee." *Id*. at 2.  At the time, Ms. Dailey was a member of Williams, Dailey, O'Leary, a law firm based in Portland, Oregon.  *Id*. at 1.

On October 8, 2004, the parties amended the Consulting Agreement.  The Amendment added Dr. Geier's son, David Geier, as a consultant and altered the timing and terms of payment as follows:

---

[2] "NVICP" means National Vaccine Injury Compensation Program.

> The Geiers understand and agree that they will not be paid for their
> time on this project until the Vaccine Court has approved their
> fees, which may not be for two or more years.  They are not
> working on a contingency fee basis but on a deferred fee basis.
> The PSC will support them in their fee petition and will help to get
> the Geiers paid fairly and fully at the appropriate time.

Compl., Ex. 2 (Amendment) at 1.[3]  The Amendment was signed by Michael L. Williams, "on

behalf of the Petitioners' Steering Committee."  Mr. Williams is a partner in the Oregon law firm

mentioned above.  That law firm is now known as Williams, Love, O'Leary & Powers, P.C.

(Williams Love).

### D.  Vaccine Court's Rejection of the Geiers' Claim for Fees

One of the test-case petitioners, Jordan King, petitioned the court for attorney

fees, expert costs, and litigation costs.  The special master ruled that the petitions were brought in

good faith and awarded substantial fees and costs.  *King*, 2011 WL 5926126 at *3-5.  The Geiers,

together with two other doctors, claimed that they were owed more than $447,000 as

compensation for work on an original medical article regarding autism and vaccines.  The

Vaccine Court determined that the article was produced for the purpose of the litigation and thus

was inherently biased.  *Id*. at *8-9.  Even more importantly, the court found that the article did

not provide *any* value to the litigation because it was deeply flawed.  The data was "dishonest

and unacceptable, involving adding numbers which [were] completely invented."  *Id*. at 9.

Because "no rational 'hypothetical paying client' of the PSC would have agreed to pay for the

production of such a flawed study," the court declined to award compensation for any amounts

related to the medical article.  *Id*. at 10.[4]

---

[3] The Amendment stated that PSC retained Dr. Geier and David Geier as "consultants and
potentially as testifying experts."  Amendment at 1.

[4] Prior to their involvement in this case, the Geiers conducted studies and published articles
concerning whether the MMR vaccine or thimerosal-containing vaccines can contribute to

In addition to the claim for compensation for work done on the medical article, the Geiers sought over $197,000 for other work. *Id*. at 25. The special master declined to provide any compensation for the work of David Geier because he was not qualified to serve as a consultant on medical issues. His only academic degree is a Bachelor of Arts with a major in biology. *Id*. at 26. With regard to Dr. Mark Geier, the court awarded only $33,130.35 in compensation and declined to award any additional amount. *Id*. at *30. The court noted that special masters in other cases had concluded that Dr. Geier was not an honest or candid witness. *See id*. at *12. One special master in particular described Dr. Geier's testimony as "intellectually dishonest" and an "egregious example of blatant, result-oriented testimony." *Id.* The court also found that despite his claim to the contrary, Dr. Geier was not an expert on the subject of epidemiology.[5] *Id*. at 15. After the test cases concluded, the PSC disbanded. *See* Autism Master File, Autism Update Jan. 12, 2011 at 2 (available at http://www.uscfsc/uscourts.gov/node/2718 (last viewed Jan. 23, 2013)).

### E. Maryland Lawsuit

In April 2011, the Geiers, father and son, filed suit in the Circuit Court of Maryland for Montgomery County, naming as defendants: (1) the PSC; (2) the Law Firms; (3)

---

causing autism. The Institute of Medicine reviewed the Geiers' studies and articles and determined that they were flawed, uninterpretable, and contributed nothing meaningful concerning the causation issue. *King*, 2011 WL 5926126, at *13-14.

[5] On April 27, 2011, the Maryland State Board of Physicians suspended Dr. Geier's medical license, finding that he "endangers autistic children and exploits their parents by administering to the children a treatment protocol that has a known substantial risk of serious harm and which is neither consistent with evidence-based medicine nor generally accepted in the relevant scientific community." *See* https/www.mbp.state.md.us/bpqapp/Orders/D2425004.271.PDF (Order for Summary Suspension of License to Practice Medicine) at 15 (last viewed Jan. 23, 2013). The Board also found that Dr. Geier falsely claimed to be a board-certified geneticist and a board-certified epidemiologist, *id*. at 2, 45, and that his "assessment and treatment of autistic children . . . far exceeds his qualifications and expertise," *id*. at 13.

Williams Love; (4) Williams Love partner Michael Williams; and (5) Williams Love partner

Tom Powers.  The Maryland complaint sought to recover the fees and costs that the Vaccine

Court declined to award in the Omnibus Autism Proceedings.  On May 22, 2012, the

Montgomery County Circuit Court dismissed the four Law Firms that are Defendants here for

lack of personal jurisdiction.  On June 11, 2012, the Geiers filed the immediate suit against them.

The Montgomery County suit remains pending against the PSC; Williams Love; Michael

Williams; and Tom Powers.

**F.  This Suit**

As in the Montgomery County case, the Geiers here seek to recover fees and costs

that the Vaccine Court declined to award in the Omnibus Autism Proceedings.  They allege that

the outstanding balance owed is $600,000.  The Complaint sets forth eight causes of action:

Count I – Breach of Contract;

Count II – Joint Venturer Liability for Breach of Contract;

Count III – Ratification;

Count IV – Implied Contract;

Count V – Unjust Enrichment;

Count VI – Joint and Several Liability for Professional Negligence (Malpractice);

Count VII – Civil Conspiracy for Fraud; and

Count VIII – Breach of Implied Warranty.

Compl. ¶¶ 13-73.  The Complaint does not allege any specific conduct by the Law Firms; it only

alleges (1) that the Law Firms represented one or more individuals whose petitions were part of

the Omnibus Autism Proceedings, and (2) that the Law Firms were members of, and agents or

representatives for, the PSC.  *Id*. ¶¶ 4-11.  The Geiers assert that "the designation of 'the PSC' on

the [Consulting Agreement and Amendment] was merely an efficient way of referring to all of the members of the PSC . . . ."  *Id.* ¶ 19.

The Law Firms each move to dismiss for lack of personal jurisdiction and failure to state a claim; each Defendant joins in the other Defendants' briefs.  The Law Firms are not residents of the District of Columbia.  Conway, Homer & Chin-Caplan ("Conway") is located in Boston, Massachusetts; John H. Kim & Associates, P.C. ("Kim") is located in Houston, Texas; Lommen, Abdo, Cole, King & Stageberg, P.A. ("Lommen") is located in Minneapolis, Minnesota; and Williams, Kherkher, Hart & Boundas LLP ("Kherkher") is located in Houston, Texas.

## II.  LEGAL STANDARD

### A. Motion to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant.  *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  The plaintiff must allege specific acts connecting the defendant with the forum.  *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001); *see First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) ("[T]he general rule is that a plaintiff must make a prima facie showing of the pertinent jurisdictional facts.").  Bare allegations and conclusory statements are insufficient.  *Second Amendment Found.*, 274 F.3d at 524.  Further, a plaintiff cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any single defendant.  *See Rush v. Savchuk,* 444 U.S. 320, 332 (1980).

In determining whether a factual basis for personal jurisdiction exists, the court should resolve factual discrepancies appearing in the record in favor of the plaintiff.  *Crane*, 894

F.2d at 456.  The court need not treat all of the plaintiff's allegations as true, however.  *Plesha v. Ferguson*, 760 F. Supp. 2d 90, 92 (D.D.C. 2011).  Instead, the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts."  *Id.* (internal quotation marks and citation omitted).

### B.  Motion to Dismiss for Failure to State a Claim

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim.  Fed. R. Civ. P. 12(b)(6).  A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.*  The facts alleged "must be enough to raise a right to relief above the speculative level."  *Id.*  In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice.  *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (internal quotation marks and citation omitted).  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face."  *Twombly*, 550 U.S. at 570.  A court must treat the complaint's factual allegations as true, "even if doubtful in fact."  *Id.* at 555.  But a court need not accept as true legal conclusions set forth in a complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

# III.  ANALYSIS

The D.C. Circuit has adopted the doctrine of "pendent personal jurisdiction," whereby a court may assert personal jurisdiction over a defendant "with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Oetiker v. Jurid Werke GmbH,* 556 F.2d 1, 5 (D.C. Cir. 1977); *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90-91 (D.D.C. 2006).

The Geiers assert that this Court has personal jurisdiction over the Law Firms with regard to at least one of the claims presented in this suit.  They ask the Court to recognize pendent personal jurisdiction with regard to all of the other claims.

## A.  Specific Jurisdiction

The Geiers first claim that the Law Firms are subject to specific jurisdiction. Specific jurisdiction exists when the cause of action arises out of or relates to the defendant's contacts with the forum.  They assert that personal jurisdiction over the Law Firms is proper under the "transacting business" and "causing tortious injury" portions of the D.C. long-arm statute, which provides:

(a) A District of Columbia court may exercise personal jurisdiction over any person, who acts directly or by an agent, as to a claim for relief arising from the person's—

(1) transacting any business in the District of Columbia;

[or]

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; . . . .

D.C. Code § 13-423(a)(1) & (3).  Subsection (b) of § 13-423 qualifies the reach of the statute by

noting that "[w]hen jurisdiction over a person is based solely upon this section, only a claim for

relief arising from acts enumerated in this section may be asserted against him."  *Id.* § 13-423(b).

       "To establish personal jurisdiction over a non-resident, a court must engage in a

two-part inquiry:  A court must first examine whether jurisdiction is applicable under the state's

long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional

requirements of due process."  *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347

(D.C. Cir. 2000).  In a diversity case such as this one, the federal district court's jurisdiction is

coextensive with that of a District of Columbia court.  *Helmer v. Doletskaya*, 393 F.3d 201, 205

(D.C. Cir. 2004).  A forum may assert specific jurisdiction over an out-of-state defendant who

has not consented to suit there so long as "the defendant has purposefully directed his activities

at residents of the forum, and the litigation results from alleged injuries that arise out of or relate

to those activities."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (internal citation

and quotation marks omitted).

       Due process limits a court's power to assert jurisdiction over a nonresident

defendant.  *Id*. at 413-14 (1984).  The due process clause of the Fifth and Fourteenth

Amendments to the U.S. Constitution requires that the defendant has "purposely established

minimum contacts with the forum State," *Burger King*, 471 U.S. at 476, "such that the

maintenance of the suit does not offend traditional notions of fair play and substantial justice."

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation

omitted).  These minimum contacts must be grounded in "some act by which the defendant

purposefully avails itself of the privilege of conducting activities with the forum State, thus

invoking the benefits and protections of its laws."  *Burger King*, 471 U.S. at 476.  In short, "the

defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *GTE New Media*, 199 F.3d at 1347 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  This standard ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contact.  *Burger King*, 471 U.S. at 475.

With respect to interstate contractual obligations, due process demands that the Court examine whether the contract had a substantial connection with the forum by looking at where the contract was negotiated and formed as well as where contract performance was contemplated.

> Because a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction, a court must evaluate the prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing to determine whether the defendant purposefully established minimum contacts within the forum.

*Helmer*, 393 F.3d at 205 (internal quotation marks omitted) (citing *Burger King*, 471 U.S. at 479).

## 1.  Transacting Business in the District of Columbia

The Geiers contend that the Law Firms transacted business in the District of Columbia, and thus this Court can exercise personal jurisdiction under D.C. Code § 13-423(a)(1).  The Geiers assert that the Law Firms purposely established minimum contacts with the District of Columbia by litigating in the Vaccine Court and by participating in the PSC, especially since attorneys with the Law Firms were part of both PSC's executive committee and expert subcommittee.  Opp. [Dkt. 15] at 16, 36.  They also point out that the PSC listed Dr. Geier

as a possible witness, and the PSC petitioned the Vaccine Court for payment of fees owed to the Geiers. *Id.*

        The Geiers' argument does not comport with the D.C. long-arm statute, which expressly limits specific jurisdiction to claims *arising from* the enumerated acts. D.C. Code § 13-423(b). "Section 13-324(b) bars any claims unrelated to the particular transaction carried out in the District of Columbia upon which personal jurisdiction allegedly is based: The claim itself must have arisen from the business transacted in the District or there is no jurisdiction." *Novak-Canzeri v. Al Saud*, 864 F. Supp. 203, 206 (D.D.C. 1994). Thus, when a case arises from breach of contract and there is no allegation that the contract was negotiated, entered into, performed, or breached in the District of Columbia, specific personal jurisdiction cannot be exercised in the District of Columbia on a claim arising from such a contract. *Id.* at 207.

        The Geiers' suit arises from the Consulting Agreement and Amendment. The Consulting Agreement and Amendment did not have a substantial connection with the District of Columbia such that the Law Firms can be said to have purposely established minimum contacts here. *See Helmer*, 393 F.3d at 205. The Consulting Agreement and Amendment were negotiated and executed by the Geiers, at that time Maryland residents, and Ms. Daily and Mr. Williams, partners in an Oregon firm. *See* Compl. ¶ 17 (PSC members visited Dr. Geier in his home in Maryland[6] and told him they wanted to hire him as a consultant for Vaccine Court litigation). While the record does not reflect where the Consulting Agreement or Amendment were executed, no one suggests that either was executed in the District of Columbia. Further, the services required under the Consulting Agreement—"[o]btaining and evaluating VSD [Vaccine Safety Datalink records], screening data, obtaining medical scientific literature as defined by

---

[6] The Geiers have since moved to Florida. Compl. ¶¶ 1-2.

client need"—contemplated that Dr. Geier would perform consulting work in Maryland where he maintained his home and place of business. *See* Consulting Agreement at 1. Although the Consulting Agreement and Amendment anticipated that the PSC *might* seek Dr. Geier's expert testimony in Vaccine Court in the District of Columbia, the PSC never did so. The mere possibility of expert testimony in the District of Columbia reveals only a tenuous connection with this forum and is insufficient on these facts to establish specific jurisdiction.

The Geiers also contend that the Consulting Agreement contemplated that PSC would petition the Vaccine Court for the payment of the Geiers' fee and that the PSC in fact did file multiple briefs in support of payment of the Geiers' fee. This allegation does not go to the negotiation, execution, or performance of the Consulting Agreement or Amendment and thus is not sufficient evidence of the contracting parties' substantial connection with District of Columbia.

The parties agree that the Law Firms were not signatories to the Consulting Agreement or its Amendment. The Geiers, however, insist that the PSC was a joint venture. They argue that the contacts of the Williams Love partners and of the PSC with the forum should be imputed to the Law Firms who are defendants here, thus rendering the Law Firms subject to personal jurisdiction in this Court. *See* Opp. at 18-20 (citing *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 95 n.1 (3d Cir. 2004) (under partnership law, any act of a partnership binds all partners; thus, personal jurisdiction based on acts of a partnership constitutes jurisdiction over all individual partners); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42 (1st Cir. 2002) (the activities of a partner are generally attributed to the partnership and jurisdiction over the partnership follows from the partner's contacts).

In support of their claim that the minimum contacts of the Williams Love partners and the PSC should be "imputed" to other PSC members, the Geiers rely primarily on a First Circuit case, *Daynard v. Ness, Motley*, where two out-of-forum law firms acted in concert to retain an expert.  In that case, a law professor sought to recover fees for services he performed as an expert in tobacco litigation.  He brought suit in Massachusetts federal district court against the law firms that hired him to do the work—Ness Motley, a Mississippi law firm, and Scruggs Millette, a South Carolina firm.  290 F.3d at 44.  While the professor was retained only by the Motley firm, he contended that the Scruggs firm also owed him fees.  The Scruggs firm moved to dismiss for lack of personal jurisdiction, and the district court granted the motion.  The First Circuit reversed, finding that personal jurisdiction was proper under the local long-arm statute's provision regarding "transacting business in the forum."  290 F.3d at 52.  The First Circuit found that the law firms held themselves out as a joint venture, and most critically, that the Scruggs firm ratified the hiring of the plaintiff professor by communicating with him regularly about the litigation in person, by phone, and by fax.  *Id*. at 58-59.

The Geiers fail to note that courts are split with regard to the theory that the act of one partner can be imputed to another for purposes of personal jurisdiction.  *See Sher v. Johnson*, 911 F.2d 1357, 1366 (9th Cir. 1990) (finding personal jurisdiction over a partnership but not its partners, even though partners are jointly liable for debts of the partnership; liability and jurisdiction are independent, and jurisdiction depends on each defendant's relationship with the forum); *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, n.16 (D.D.C. 2011) (noting without discussion that personal jurisdiction over the members of a partnership must be based on the individual actions of each partner).  The D.C. Circuit has not ruled on this issue.

Moreover, the Geiers' argument that the acts of the PSC and the Williams Love firm should be imputed to the Law Firms for the purpose of personal jurisdiction is based on the faulty assumption that the PSC itself was a joint venture.  District of Columbia law defines a joint venture as follows:

> A joint venture is an association of persons with intent, by way of express or implied contract, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each participant shall stand in the relation of principal as well as agent as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the venture.

*United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 505 F. Supp. 2d 20, 30 (D.D.C. 2007); *see also Wash. Inv. Partners of Del., LLC v. The Sec. House, KSCC*, 28 A.3d 566, 578 (D.C. 2011) (equal right to direct and control is key to a joint venture).  The PSC was *not* formed by contract or agreement between petitioners' counsel in Vaccine Court.  Rather, the Geiers acknowledge the PSC was a "judicially created organization of attorneys and law firms." Compl. ¶ 3.  Its membership was *not* in the control of the members.  The Vaccine Court ordered the creation of the PSC and explicitly retained authority to appoint its members if the attorneys could not agree.  *See* Autism General Order #1.  Also, the PSC was *not* established by the Vaccine Court for the purpose of achieving profit in a single business venture.  The Vaccine Court created the PSC as a matter of docket control for the purpose of efficient discovery and presentation of evidence to the Court on the shared issue of causation, an issue that affected all 5,000 cases.  *See id.*

Further, pursuant to statute, members of the PSC were paid by the Vaccine Court only for the value of the work they completed.  *See* 42 U.S.C. § 300aa-15(e)(1).  The Geiers

16

make the valid point that attorneys profit by charging fees, but there was no agreement among the law firms to "share profits."  In fact, there was no financial incentive for the law firms to take part in the PSC, as each firm would be able to charge fees (and make profits) if each litigated its own case on causation, rather than combining under court order.  Again, the Vaccine Court created the PSC for the purpose of court efficiency, and not for the purpose of providing the law firms with a profit.  Finally, the Law Firms did not have control over the existence of the PSC, the court did; when the test cases were concluded, the Vaccine Court disbanded the PSC.

Because the PSC was not a joint venture, joint venture law does not apply.  Even if this Court adopted the theory that the acts of a joint venturer could be imputed to others for purposes of personal jurisdiction, without the existence of a joint venture, the acts and contacts of the PSC and the Williams Love partners cannot be imputed to the Law Firms.[7]  The Geiers have not presented a factual basis for the exercise of jurisdiction under the "transacting business" provision of the long-arm statute.

## 2.  Causing Tortious Injury In The District Of Columbia

The Geiers also contend that the Law Firms are subject to personal jurisdiction because they caused "tortious injury in the District of Columbia by an act or omission in the

---

[7] The Geiers also claim that the acts of the PSC and the Williams Love firm should be imputed to the Law Firms under the theory of "partnership by estoppel."  When individuals act as a partnership, even if there is no partnership, they can be liable to one who entered into a transaction with the purported partnership relying on the representation that a partnership existed.  *See* D.C. Code § 29-603.08(a); *McGrath v. McGrath*, 4 F.2d 297, 298-99 (D.C. App. 1925) ("Having thus been held out to be a partner, and having participated in the business of the concern, and in the settlement and distribution of its assets, he is now estopped to deny partnership for the mere purpose of avoiding the enforcement of a lawful judgment against him . . . .").  The Geiers have not alleged that the Law Firms did anything to hold themselves out as part of a partnership, that they participated in a mutual business concern, or that they shared assets.  This theory of personal jurisdiction also fails.

District of Columbia" under D.C. Code § 13-423(a)(3).  The Geiers argue that they were clients

of the Law Firms and that the Law Firms committed malpractice in the District of Columbia

when they failed to file adequate briefs or make adequate arguments in support of the Geiers'

claim for fees in the Vaccine Court. The Geiers posit that because the PSC was required under

the Consulting Agreement and Amendment to assist the Geiers in petitioning the Vaccine Court

for payment of their fee, this obligation created an attorney-client relationship between the

Geiers and the PSC's constituent law firms.

   This argument too is based on a faulty assumption—that there was an attorney-

client relationship between the Geiers and the Law Firms.  A threshold requirement for a legal

malpractice action is the existence of an attorney-client relationship.  *See Taylor v. Akin, Gump,*

*Strauss, Hauer & Feld*, 859 A.2d 142, 147 (D.C. 2004).  An attorney-client relationship "hinges

on the client's intention to seek legal advice and his belief that he is consulting an attorney."

*Jones v. United States*, 828 A.2d 169, 176 (D.C. 2003).  The Geiers allege that the Law Firms

agreed to "support them in their fee petition" under the terms of the Amendment.  There is no

allegation that the Geiers consulted the Law Firms for legal advice or that the Law Firms agreed

to represent the Geiers as their attorneys.  Because there is simply no basis for Count VI alleging

malpractice, it cannot serve as a basis for personal jurisdiction.

   In addition, D.C. Code § 13-423(a)(3) requires that any tortious injury occur in

the District of Columbia.  A corporation that suffers financial losses suffers such losses at its

business location.  *See Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d

1, 10-11 (D.D.C. 2009).  The Geiers allege that they suffered a financial loss due to the Law

Firms' malpractice, but the Geiers' business and residence were located in Maryland during the

relevant time period.  Thus, to the extent they suffered a financial loss, the loss occurred in

Maryland and not in the District of Columbia. Therefore, the Law Firms are not subject to personal jurisdiction based on the allegation that they caused "tortious injury in the District of Columbia." *See* D.C. Code § 13-423(a)(3).

In sum, the Geiers have failed to present a factual basis for the Court's exercise of specific personal jurisdiction over the Law Firms. *See Crane*, 894 F.2d at 456; *First Chicago*, 836 F.2d at 1378.

### B. General Jurisdiction

Under the D.C. Code provision governing general jurisdiction, a District of Columbia court "may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief." D.C. Code § 13-422. "Continuous and systematic" contacts with a forum can give rise to general jurisdiction, which allows the court to exercise general personal jurisdiction over a defendant in a suit not arising out of the defendant's contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-15 & n. 9 (1984).

The *Helicopteros* case demonstrates the limits that due process places on general personal jurisdiction. There, the defendant was a nonresident corporation that did not have an office in the forum state of Texas and was not licensed to do business in that state. 466 U.S. at 416. The defendant's contacts with Texas consisted of sending its CEO to Texas to negotiate a contract, purchasing equipment from a Texas company, and sending personnel to Texas for training. *Id.* The Supreme Court determined that these contacts were insufficient to satisfy the due process requirements that apply to the exercise of general jurisdiction. *Id.* at 418-19.

A court in this district recently addressed the question of whether a law firm's representation of clients in another state was sufficient to satisfy due process in that state. In

*Klayman v. Barmak*, 634 F. Supp. 2d 56 (D.D.C. 2009), a former employee of a non-profit

government watchdog organization brought an action in Florida state court against an attorney

and his law firm who had acted as outside general counsel for the non-profit.  The case was

removed to federal court and transferred for venue reasons to federal district court in the District

of Columbia.

In order to determine whether D.C. law or Florida law applied to the case, the

district court had to determine whether personal jurisdiction was proper over the attorney and his

firm in Florida.  The attorney was a Maryland resident who practiced in the District of Columbia,

but who had also appeared in court in Florida.  The firm had offices in the District of Columbia

and some other cites, but had no offices in Florida.  The firm had appeared pro hac vice in

Florida from time to time.  The court held that counsel and the firm's appearing on behalf of

clients in isolated law suits in Florida did not constitute "continuous and systematic" contacts

that satisfied due process.  There was no evidence that the attorney or the law firm "sought

business in Florida or sent staff there for any engagement beyond the scope of isolated lawsuits."

634 F. Supp. 2d at 62.  *See also Snow v. DirectTV, Inc*., 450 F.3d 1314, 1316 (11th Cir. 2006)

(general jurisdiction could not be exercised over a law firm that had no physical presence in the

state, did not solicit clients in the state, and derived less than one percent of its business from

matters connected with the state).

The Geiers claim that the Law Firms regularly represent petitioners in Vaccine

Court and that this is sufficient to demonstrate "continuous and systematic" contacts with the

District of Columbia.  They assert that (1) the Kim firm represents itself as being involved with

vaccine litigation in the District of Columbia; (2) the Conway firm's website advertises that it

represents 1200 people from all 50 states who have filed for compensation under the Vaccine

Act, and that the firm is "solely dedicated" to vaccine injury cases; (3) the Lommen firm advertises itself as vaccine litigators; and (4) the Kherkher firm holds itself out as committed to vaccine cases in the District of Columbia.  Opp. at 30-31.  The Geiers seek discovery to determine the actual extent of the Law Firms' contacts with the District of Columbia and whether general jurisdiction is proper.  Whether to permit jurisdictional discovery rests in the discretion of the district court.  *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1089 (D.C. Cir. 1998).  The plaintiff must demonstrate that he can supplement his jurisdictional allegations via discovery.  *GTE New Media*, 199 F.3d at 1351.

The Law Firms are not organized under the laws of the District of Columbia and do not maintain their principal places of business here.  Conway is located in Massachusetts; Lommen is located in Minnesota; and both Kim and Kherkher are located in Texas.  Compl. ¶¶ 4-10; *see also* Kherkher Mot. [Dkt. 6] at 7 (Kherkher does not maintain an office in the District of Columbia and its lawyers are not members of the District of Columbia bar).  While it is clear that the law firms have represented petitioner(s) in Vaccine Court, the record does not contain sufficient evidence to determine whether the Law Firms' contacts with the forum were "continuous and systematic."[8]  This question need not be answered, however, because the Complaint fails to state a claim upon which relief can be granted.

---

[8] The Law Firms erroneously assert that the Court cannot exercise personal jurisdiction over them based on their contacts with Vaccine Court, as those contacts should be disregarded under the "government contacts" doctrine.  Pursuant to the government contacts exception, "entry into the District of Columbia by nonresidents for the purpose of contacting federal governmental agencies is not a basis for the assertion of in personam jurisdiction."  *Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 813 (D.C.1976).  Subsequent cases have limited the exception to cases where the contacts with the government constituted an exercise of First Amendment rights.  *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 248 (D.C. 1990)  When an attorney represents a client in the District of Columbia, he transacts business here as an agent for his client; he does not exercise his own First Amendment rights.  *Id*. at 248-50.  Thus, the government contacts doctrine does not apply under such circumstances.  *Id*.

### C.  Failure to State a Claim

Even if the Court has personal jurisdiction over the Law Firms due to their continuous and systematic contacts with the District of Columbia, it is necessary to dismiss the Complaint for failure to state a claim.

### 1.  Breach of Contract

The Geiers allege breach of contract in Count I of the Complaint.  A breach of contract claim necessarily depends on the formation of a contract.  The essential elements of a contract are "competent parties, lawful subject matter, legal consideration, mutuality of assent and mutuality of obligation."  *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1445, 1450 (D.C. Cir. 1996) (citations omitted).  For an enforceable contract to exist under D.C. law, there must be agreement as to all material terms—subject matter, price, payment terms, quantity, quality, and duration—and an intention of the parties to be bound.  *Virtual Defense & Dev. Intern., Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 17-18 (D.D.C. 2001) (citation omitted).  To state a claim for breach of contract, a complaint must allege facts from which the necessary "meeting of the minds with respect to the material terms" can be found or reasonably inferred.  *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007) (citation and internal quotation mark omitted).

Count I alleges that Ms. Dailey executed the Consulting Agreement for the PSC and that the Law Firms were part of the PSC, *see* Compl. ¶¶ 16-19, and that Mr. Williams executed the Amendment as a "representative of the PSC and all Defendants herein."  *Id*. ¶ 24; *see also* Compl., Exs. 1 & 2.  The Geiers argue that even if the PSC was not a joint venture or other type of legal entity, *see* Compl. ¶ 16, the Law Firms are liable as "promoters."  Opp. at 32-34.

Generally, when a promoter signs a contract on behalf of a nonexistent principal, the promoter renders himself liable on the contract. *See Robertson v. Levy*, 197 A.2d 443, 447 (D.C. 1964) (when an individual purports to act on behalf of a corporation and the corporation has not yet been formed, the individual is liable for the debts he incurred). While a promoter can be held liable when he acts for a non-existent entity, he does not by his actions bind others. For example, in *Shoreham Hotel Ltd. Partnership v. Wilder*, 866 F. Supp. 1, 4 (D.D.C. 1994), a hotel sued members of an unincorporated association for the cost of the association's conference at the hotel. The hotel sought to hold liable the person who actually signed the contract in D.C. Superior Court. It also filed a claim in federal district court against members of the association's steering committee. The district court refused to find the steering committee members liable simply because they were involved in planning the conference or simply because one committee member purported to act on behalf of the organization. *Id*. The court distinguished cases finding association members liable because in those cases the members had themselves negotiated the contract or authorized the services. *Id*.

Here, the individuals who signed the Consulting Agreement and Amendment on behalf of the PSC may or may not be liable on the contract, but they could not bind others. There is no allegation that the Law Firms negotiated the contract or authorized the Geiers' services. Thus, Count I (breach of contract) will be dismissed under Rule 12(b)(6).

### 2. Joint Venture Breach of Contract

As an alternative to their claim that the PSC was not a legal entity, Count II of the Complaint alleges that the PSC was a joint venture and the Law Firms are liable as joint

venturers.[9]  *Id.* ¶¶ 29-36.  As explained above, the Geiers do not allege facts sufficient to demonstrate the existence of a joint venture.  The Vaccine Court ordered the creation of the PSC for the purposes of efficient discovery and presentation of evidence on the shared issue of causation, and the Vaccine Court explicitly retained authority to appoint its members.  *See* Autism General Order #1.  There was no agreement among the Law Firms to share profits. Because the PSC was not a joint venture, the Law Firms cannot be liable as purported joint venturers.  Count II, joint venture breach of contract, will be dismissed.

### 3.  Ratification

The Geiers also claim that the Law Firms are liable under a theory of ratification, *i.e.*, that they affirmed the Consulting Agreement and Amendment and thus should be held liable as if they had originally authorized the contract.  *See Monument Realty LLC v. WMATA*, 535 F. Supp. 2d 60, 71 (D.D.C. 2008).  Ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Id.*  "Ratification requires that a party intend to affirm the contract with full knowledge of all material facts and circumstances." *Avianca, Inc. v. Corriea*,  Civ. No. 85-3277(RCL), 1992 WL 93128, at *8 (D.D.C. Apr. 13, 1992).  The doctrine of ratification applies only if the intent to ratify was "crystal clear" and "unequivocal." *Id.*  The Geiers allege that the Law Firms knew about the contract with the Geiers, took no steps to disavow it, and paid funds to the PSC so that the PSC could pay its bills.  There is no allegation that the Law Firms reviewed the Consulting

---

[9] The Geiers argue that the nature of the PSC under the law (whether it is a "legal entity") is a fact question.  *See* Opp. at 34.  In deciding the Law Firms' motions to dismiss, it is not necessary to decide whether the PSC existed as a legal entity.

Agreement and Amendment, had full knowledge of the contract terms, or clearly intended to be bound.  Thus, Count III (ratification) will be dismissed without prejudice.

### 4.  Implied Contract

The Geiers allege in Count IV that the Law Firms are liable on an "implied contract" between the parties.  "An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt."  *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C. 1993).  To recover under an implied contract, a plaintiff must show that (1) valuable services were rendered; (2) for the person sought to be charged; (3) which services were accepted, used, and enjoyed by the person sought to be charged; (4) under such circumstances as reasonably notified the person sought to be charged that the person rendering the service reasonably expected to be paid by him.  *Id.*; *see also Union Light & Power Co. v. D.C. Dep't of Empl. Servs.*, 796 A.2d 665, 671 (D.C. 2002) (plaintiff must show that he reasonably expected payment from the defendant).  The fourth element is in dispute here.

A similar case was decided by the District of Columbia Court of Appeals in *Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*, 870 A.2d 58 (D.C. 2005).  The Jordan Keys law firm entered into an express contract with a hospital to provide legal services in defending a malpractice claim filed by a former patient.  *Id.* at 60.  St. Paul Fire & Marine Insurance Company provided excess liability insurance to the hospital that would cover the hospital's malpractice liabilities in excess of $1,000,000.  The hospital filed for bankruptcy protection without having paid its legal bills, and Jordan Keys sued St. Paul to recover fees for

legal services provided in the malpractice case.  Jordan Keys acknowledged that its contract required the hospital to pay its fees.  *Id*.

Nonetheless, Jordan Keys alleged that St. Paul was liable for its fees under an implied contract theory.  The trial court rejected this claim and the court of appeals affirmed, finding that Jordan Keys failed to allege the fourth element of an implied contract claim.  "At the time Jordan Keys provided services to the Hospital, St. Paul was not placed on notice that Jordan Keys expected to be paid for those services by St. Paul.  On the contrary, as Jordan Keys acknowledges, it contracted to be paid by its client, the Hospital, and not by the Hospital's excess carrier, a party with which Jordan Keys had no agreement at all."  *Id*. at 62.

As in *Jordan Keys*, the Geiers provided services to the PSC and the William Love firm under an express contract, the Consulting Agreement and Amendment.  The Law Firms were not parties to the Consulting Agreement or the Amendment.  The Geiers do not allege that they had any direct contact with the Law Firms in connection with the cases in Vaccine Court.  *See, e.g.,* Kim Mot. to Dismiss [Dkt. 7] at 13 n.2 (the Kim firm had no contact with the Geiers in connection with the Omnibus Autism Proceeding).  Instead, in support of the implied contract claim they allege that the Law Firms knew the PSC was not a legal entity and that each firm implicitly entered into a contract with the Geiers on its own behalf.  Compl. ¶ 41.  In opposition to the motions to dismiss, the Geiers make the additional allegation that the Law Firms were on the "expert subcommittee" for the PSC and that "[i]t is difficult to imagine that the parties occupying these positions were not aware of the retention and payment of these expert witnesses."  Op. at 36-37.  These allegations are too tenuous to allege notice to the Law Firms that the Geiers expected to be paid by them.  Absent such notice, the Geiers' implied contract claim is untenable.  *See Jordan Keys*, 870 A.2d at 62.  Because the Geiers have failed to state a

necessary element of a claim for breach of implied contract, the claim (Count IV) will be
dismissed without prejudice.

### 5. Unjust Enrichment

The Geiers' claim for unjust enrichment fails as well.  A claim for "unjust
enrichment" is also known as a claim for "quantum meruit recovery."  Such a claim may arise
from an implied-in-law contract or "quasi-contract,"[10] which requires compensation to be
rendered from a party that has been unjustly enriched.  *Vereen*, 623 A.2d at 1193.  "Unjust
enrichment occurs when a person retains a benefit . . . which in justice and equity belongs to
another."  *Jordan Keys*, 870 A.2d at 63; *accord Kramer Assoc., Inc. v. Ikam, Ltd.*, 888 A.2d 247,
254 (D.C. 2005) (a claim for unjust enrichment may be asserted when one party receives a
benefit from another for which in fairness the other should be compensated).

In *Jordan Keys*, the District of Columbia Court of Appeals held that Jordan Keys
could not recover on a theory of quantum meruit because the St. Paul Insurance Company was
not *unjustly* enriched.  Rather, "it was contemplated from the outset of the malpractice suit . . .
against the Hospital that St. Paul would receive the benefits of Jordan Keys' representation of the
Hospital."  *Id*. at 65.  The court explained:

> There can be no doubt that the Hospital's bankruptcy significantly
> altered the legal terrain insofar as Jordan Keys was concerned.
> Jordan Keys had expected to be fully compensated by the Hospital,
> and its client's bankruptcy shattered these expectations.
> Nevertheless, in the absence of some unanticipated and unjust
> enrichment of St. Paul, the loss resulting from the Hospital's
> inability to meet its obligations must be borne by the party that
> contracted with the Hospital, namely, Jordan Keys.

---

[10] A quasi-contract is a legal fiction by which a court permits contractual recovery where there is
no contract, but where "circumstances are such that justice warrants a recovery as though there
had been a promise." *Jordan Keys*, 870 A.2d at 63 (quoting Black's Law Dictionary 324 (6th Ed.
1990))

*Id.* at 66.

The Geiers may have expected to be paid by the Williams Love partners who had signed the Consulting Agreement and Amendment.[11]  They have not alleged facts showing that they could have reasonably expected non-signatories to pay them.  Also, from the outset, the Geiers contemplated that their work would benefit all of the petitioners' counsel in Vaccine Court, whether or not such counsel were members of the PSC, and thus the Law Firms were not *unjustly* enriched.  Further, given the reaction of Vaccine Court to the Geiers it is doubtful that the Law Firms were particularly benefitted by the Geiers' services.[12]  The Court will dismiss Count V for unjust enrichment.[13]

### 6. Malpractice

As explained above, to state a claim for attorney malpractice, a plaintiff must allege an attorney-client relationship.  *See Taylor*, 859 A.2d at 147.   There is no plausible allegation that the Geiers consulted the Law Firms for legal advice or that the Law Firms agreed to represent the Geiers as their attorneys.  The Geiers' malpractice claim is based on the

---

[11] Even this point is doubtful, since the terms of the Amendment made clear that expert fess would be submitted to the Vaccine Court for payment from the National Childhood Vaccine Injury Compensation fund.  *See* Amendment at 1 ("The Geiers understand and agree that they will not be paid for their time on this project until the Vaccine Court has approved their fees."); 42 U.S.C. § 300aa-15(e) (1)(B) (Vaccine Court may award reasonable attorneys' fees and costs if the petition was brought in good faith and there was a reasonable basis for the claim).

[12] The Court takes judicial notice of the orders by which the Vaccine Court determined the value that the Geiers generated to the Vaccine Court petitioners and compensated the Geiers.  The Geiers received compensation for the benefit they conferred.

[13] The Law Firms point out that there can be no recovery for unjust enrichment when there is an express contract between the parties.  *See Schiff v. Am. Ass'n of Retired Person*, 697 A.2d 1197, n.2 (D.C. 1997).  While accurate, the argument is not dispositive because a plaintiff is permitted to plead in the alternative.  *See McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*, 636 F. Supp. 2d 1, 21 n.10 (D.D.C. 2009).

disingenuous assertion that the agreement to assist the Geiers in petitioning the Vaccine Court for fee payment created an attorney-client relationship between the Geiers and the Law Firms. This allegation is not "plausible on its face." *Twombly*, 550 U.S. at 570.  Count VI (Malpractice) will be dismissed for failure to state a claim.

### 7.  Civil Conspiracy for Fraud

The Geiers allege in Count VII of the Complaint that the Law Firms are liable for civil conspiracy to commit fraud.  The elements of civil conspiracy are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) (citing *Griva v. Davison,* 637 A.2d 830, 848 (D.C. 1994)).  There is no independent action in the District of Columbia for civil conspiracy; it is a means for establishing vicarious liability for an underlying tort.  749 A.2d at 738.

Here, the alleged underlying tort alleged is fraud, a claim that must meet a heightened pleading requirement.  Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity" the circumstances constituting the alleged fraud.

> [T]his means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud. The rule serves to discourage the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude. . . . And because "fraud" encompasses a wide variety of activities, the requirements of Rule 9(b) guarantee all defendants sufficient information to allow for preparation of a response.

*United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (internal quotation marks and citations omitted).  Further, one who alleges a conspiracy must allege an event,

conversation, or document showing that there was an agreement among the alleged conspirators. *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113-14 (D.D.C. 2010).

The Geiers' civil conspiracy allegations are threadbare accusations that fail to state a claim, *see Iqbal*, 556 U.S. at 678, let alone meet the heightened pleading standard required by Rule 9(b).  The Complaint alleges that the Williams Love partners "convinced the Geiers to agree to defer their fees for several years until such time as the PSC could file a fee application" and that they "intended to and did deceive the Geiers into performing hundreds of hours of consulting services with no realistic or feasible means of recovering their fees."  Compl. ¶¶ 66-67.  The Complaint alleges that Ms. Dailey and Mr. Williams acted as representatives for the Law Firms and that the Law Firms colluded with Mr. Williams.  *Id*. ¶¶ 68-69.  The Geiers fail to allege the time, place, and content of the false representations.  Further, the Complaint does not allege any event, conversation, or document showing that there was an agreement between the Williams Love partners and the Law Firms.  The claim for civil conspiracy for fraud, Count VII, will be dismissed without prejudice.

### 8.  Breach of Implied Warranty

The Law Firms also moved to dismiss Count VIII (Breach of Implied Warranty). The Geiers failed to address this issue in their response brief.  "It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)). Accordingly, the motion to dismiss the breach of implied warranty claim (Count VIII) will be granted, and that Count will be dismissed as conceded.

## IV.  CONCLUSION

For the reasons stated above, the motions to dismiss filed by the Law Firms:

Conway, Homer & Chin-Caplan; John H. Kim & Associates, P.C.; Lommen, Abdo, Cole, King

& Stageberg, P.A.; and Williams, Kherkher, Hart & Boundas LLP [Dkt. 6, 7, 8, 9] will be

granted, and this case will be dismissed.  A memorializing Order accompanies this Opinion.


Date:  February 8, 2013                                    _____/s/_____
                                                           Rosemary M. Collyer
                                                           U.S. District Judge